IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| LYNX SERVICES LLC,<br>    Plaintiff,<br><br>v.<br><br>STATE FARM MUTUAL<br>AUTOMOBILE INSURANCE<br>COMPANY et al,<br>    Defendants. | Case No. 1:25-cv-01251-JEH-RLH |

### Order

Now before the Court is the Defendant State Farm Mutual Automobile Insurance Company's Motion for Leave to File Under Seal (D. 36), the Sealed Motion to Dismiss (D. 37), the Redacted Motion to Dismiss (D. 38), and the Defendants Safelite Group Inc. and Safelite Solutions LLC's Motion for Leave to File Under Seal (D. 39), the Sealed Motion to Dismiss (D. 40), and the Redacted Motion to Dismiss (D. 41).[1] For the reasons set forth *infra*, the Motions for Leave to File Under Seal (D. 36 & D. 39) are granted, the Sealed and Redacted Motions to Dismiss (D. 37 & D. 38) are granted and denied in part with leave to renew, and the Sealed and Redacted Motions to Dismiss (D. 40 & 41) are denied with leave to renew. The case is hereby stayed pending completion of mediation, and the parties are directed to file a status report within fourteen days of its conclusion.

**I**

On June 27, 2025, the Plaintiff Lynx Services LLC ("Lynx") file a Complaint and Motion for Temporary Restraining Order and Preliminary Injunction. (D. 2 &

---

[1] Citations to the electronic docket are abbreviated as "D. ___ at ECF p. ___."

D. 4). On the same day, the Court scheduled a hearing on the Motion for June 30, 2025. *See* 06/27/2025 Text Order. On June 30, 2025, the Court denied the Motion for a Temporary Restraining Order and the Motion for a Preliminary Injunction. *See* 06/30/2025 Minute Entry. On August 19, 2025, the Defendant State Farm Mutual Automobile Insurance Company ("State Farm") and the Defendants Safelite Group, Inc., and Safelite Solutions LLC, (collectively "Safelite") filed Motions to Dismiss. (D. 37, 38 & D. 40, 41). On September 5, 2025, the Plaintiff filed its Responses (D. 45 & 46) to which the Defendants filed their Replies on September 16, 2025 (D. 49 & 50). The matter is now fully briefed.

II

According to the Complaint, Lynx "administered State Farm's glass claims" for nearly thirty years. (D. 2 at ECF p 1). Effective July 1, 2025, State Farm terminated its relationship with Lynx and hired its "direct competitor (Safelite) as its new third-party administrator for its glass claims" and "represented to its National Auto Glass Shop participants that 'there would be no changes' to State Farm's National Glass Program." *Id.* Lynx claims that, for this to be true, State farm would "have to continue using Lynx's confidential and proprietary information." *Id.* at ECF p. 1-2. Lynx alleges that Safelite "availed itself of information that State Farm shared to help Safelite be a more efficient third-party administrator" and that "Safelite's use of Lynx's confidential information and trade secrets" would "continue to save substantial amounts in indemnity costs" for State Farm. *Id.* at ECF p. 2. Lynx alleges that "State Farm and Safelite both refused" to return the confidential information "after Lynx provided them notice of their misappropriation" and that, jointly, Safelite and State Farm will "gain further competitive advantage" over Lynx by improperly using its "confidential information and trade secrets" to develop a "virtually identical Glass Program management system." *Id.* at ECF p. 3.

2

As part of Lynx's Glass Program, it "utilizes multiple proprietary tools" including the "METRYX® Industry Services Registry" ("METRYX") which "is a web-based, password-protected application hosted on Lynx's website that provides auto glass service providers the opportunity to register and maintain their capabilities in a profile." *Id.* at ECF p. 6. METRYX provides "insurance, fleet, and cash customers more complete information concerning an auto glass service provider's capacity, service offerings, professional qualifications, and credentials." *Id.* "METRYX is a customized platform that Lynx developed after years of observing how auto glass service providers and the insurance industry operate and identifying ways that Lynx could improve efficiencies." *Id.* "With METRYX, auto glass service providers and insurance companies can accurately represent their glass service providers' capabilities to policyholders who report a glass loss." *Id.* Lynx further claims that the "entire compilation of data that LYNX maintains about the glass service providers in METRYX is substantial, and it includes without limitation: company name, address, phone number, hours of operation, whether a mobile service is offered, the service area, the types of repairs offered, technician credentials, technician qualifications, relevant training, mobile capabilities, and related information." *Id.* at ECF p. 7. As part of METRYX, Lynx claims that it uses a specific pricing strategy that it considers confidential and trade secret information, called "METRYX Pricing Strategy" that "allows specific pricing decisions to be made in a way that make the entire industry more efficient and fair" and is "unique in the industry today." *Id.* at ECF p. 7-8.

Lynx also alleges that "Customized Offers" is "another proprietary tool developed" by Lynx "that is tied to the METRYX service center and service area pricing logic derived from the METRYX registry data." *Id.* at ECF p. 8. It "allows auto glass service providers to offer an additional discount to an insurance company in exchange for additional opportunities for nonchoice referrals" and

3

Lynx "maintains a substantial database of records reflecting, specific, historical customized offers" that has saved State Farm "millions of dollars." *Id.* Both the "METRYX registry information and the Customized Offers information" ("Lynx Information") help Lynx establish its competitive advantage and as such, the information is "not generally known or readily ascertainable by the public." *Id.* at ECF p. 9. Instead, Lynx "only provides limited access to these trade secrets to authorized insurance companies and glass service providers that enter agreements with" Lynx, along with taking other measures to ensure the information is kept secret. *Id.*

In 2017, Lynx entered into an Agreement with State Farm. *Id.* at ECF p. 11. That agreement was renewed on June 29, 2022, which extended its effective date until July 1, 2025. *Id.* Lynx alleges that, as part of that Agreement, "State Farm acknowledges that during performance of the Agreement, it 'may learn or have access to certain confidential, . . . trade secret, proprietary or other like information or products of [Lynx] or of third parties" and that State Farm agreed to "'keep strictly confidential' Lynx's trade secrets and other confidential information." *Id.* Lynx further alleges that in Supplement #1 to the Agreement, State Farm acknowledged Lynx's "exclusive ownership of its METRYX and Customized Offer Tools." *Id.* Therefore, when State Farm announced on March 31, 2025, that it would be using Safelite as its third-party administrator, replacing Lynx on July 1, 2025, and stated that there would "be no changes to [State Farm's] National Glass Program", Lynx became concerned "about its proprietary and trade secret information". *Id.* at ECF p. 12. For that reason, Lynx reached out to "Mr. John Simmons of State Farm to discuss State Farm's confidentiality obligations under the Agreement" to which an attorney from State Farm allegedly informed Lynx that any Lynx Information "shared with State Farm was owned by State Farm." *Id.* at ECF p. 13. Given State Farm's prior statements, Lynx alleges State Farm "is

4

proceeding to act in willful disregard to Lynx's trade secret information and its contractual obligations to" Lynx and that State Farm is using Lynx's "trade secret information and has shared, plans to share, and/or will inevitably share" that "confidential, proprietary, and trade secret information with Safelite" *Id.* Lynx alleges "Safelite's 'new' National Offer and Acceptance Agreement . . . describes METRYX's Pricing Strategy in identical terms as the National Offer and Acceptance Agreements that Lynx signed with auto glass service providers" and claims that as evidence that Safelite is misappropriating Lynx's trade secrets. *Id.* at ECF p. 13-14.

Based on these allegations, Lynx filed a Seven-Count Complaint. (D. 2 at ECF p. 32). As against State Farm, Lynx alleges Breach of Contract (I), Unjust Enrichment (II), violation of the Defend Trade Secrets Act (III), and violation of the Illinois Trade Secrets Act (IV). *Id.* at ECF p. 15-23. As against Safelite, Lynx alleges violation of the Defend Trade Secrets Act (V), violation of the Illinois Trade Secrets Act (VI), and an Illinois common law claim of Unfair Competition (VII). *Id.* at ECF p. 23-32. The Defendants have moved to dismiss all claims pursuant to Rule 12(b)(6). *See* (D. 36 & D. 39).

### III

Federal Rule of Civil Procedure 12(b)(6) governs whether a complaint fails to state a claim. FED. R. CIV. P. 12(b)(6). Federal Rule of Civil Procedure 8(a)(2) provides that a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief". FED. R. CIV. P. 8(a)(2). A "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at

663. A plaintiff "must give enough details about the subject-matter of the case to present a story that holds together." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Similarly, a complaint that "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" will not survive a motion to dismiss. *Id.* The Court is to draw all reasonable inferences in favor of the non-movant, but the Court "need not accept as true any legal assertions or recital of the elements of a cause of action 'supported by mere conclusory statements.'" *Vesely v. Armslist LLC*, 762 F.3d 661, 665-66 (7th Cir. 2014) (quoting *Alam v. Miller Brewing Co.*, 709 F.3d 662, 666 (7th Cir. 2013)).

In Count One, the Plaintiff alleges breach of contract against State Farm, claiming that State Farm "willfully breached Section 5(a) of the Agreement by intentionally disclosing Lynx's confidential information and trade secrets" to Plaintiff's competitor, Safelite. (D. 2 at ECF. 15). In response, State Farm contends that Count One ought to be dismissed because Lynx "did not—and cannot—allege performance of all conditions precedent to filing suit, namely that it completed the mandatory dispute-resolution process in the Agreement" and, therefore, Count One is "missing a necessary element of a claim for breach of contract" and "must be dismissed." (D. 38 at ECF p. 7-8). For the reasons that follow, the Court grants the Motion to Dismiss Count One without prejudice and the Plaintiff shall have leave to amend.

"To establish a claim for breach of contract under Illinois law, a plaintiff must show: '(1) offer and acceptance, (2) consideration, (3) definite and certain terms, (4) performance by the plaintiff of all required conditions, (5) breach, and (6) damages.'" *Yash Venture Holdings, LLC v. Moca Fin., Inc.*, 116 F.4th 651, 657 (7th Cir. 2024) (quoting *Ass'n Benefit Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 849

(7th Cir. 2007)). In this case, the Court may consider the Agreement for purposes of ruling on the Motion to Dismiss. *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012). In consideration of the Agreement and Count One, Lynx alleges a "valid, binding, and enforceable written contract signed by both parties" that was effective until July 1, 2025. (D. 2 at ECF p. 15). Lynx alleges definite terms, consideration, breach, and damages. *Id.* However, as to the fourth element—which State Farm challenges—Lynx does not allege that it performed all the required conditions under the Agreement. (D. 38 at ECF p. 8). On that point, State Farm is technically correct, Lynx does not expressly allege that it performed under the contract. *See* (D. 2 at ECF p. 15). But more than that, State Farm contends that "Lynx cannot in good faith allege that it has complied with the conditions precedent to suit" as required under the Agreement pursuant to "Paragraph 30 [which] sets forth 'the sole and exclusive procedures for the resolution' [of] any 'dispute arising out of or relating to this Agreement, including its interpretation, validity or enforceability.'" (D. 38 at ECF p. 8). In particular, State Farm alleges Paragraph 30 "sets forth multiple steps that must be followed before either party may initiate litigation," and that Lynx did not perform "*any* of those steps in advance of filing suit" as required under the "mandatory dispute-resolution provision in the Agreement". (D. 38 at ECF p. 8-9) (emphasis in original). Paragraph 30 of the Agreement reads in relevant part:

> **Any dispute arising out of or relating to this Agreement, including its interpretation, validity or enforceability, shall be resolved in accordance with the procedures specified in this Section 30, which shall be the sole and exclusive procedures for the resolution of any such disputes.** The parties shall attempt in good faith to resolve any dispute arising out of or relating to this Agreement promptly by negotiation between leadership who have authority to settle the controversy and who are at a higher level of management than the persons with direct responsibility for administration of this

Agreement. **Within 30 days after receiving written notice of a dispute, the receiving party shall submit to the other a written response.** The dispute notice and response shall include (a) a statement of that party's position and a summary of arguments supporting that position, and (b) the name and title of the leader who will represent that party and of any other person who will accompany the executive. **Within 90 days after delivery of the initial notice, or such other time frame as may be agreed by the parties, the executives of both parties shall meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the dispute. If the dispute has not been resolved by negotiation as provided herein within 120 days after delivery of the initial notice of negotiation, or if the parties failed to meet as required hereunder, either party may commence nonbinding mediation process under the CPR Mediation Procedure by providing to the other party written notice.** The parties will select one mediator from the CPR Panels of Distinguished Neutrals. The initial mediation session shall be held within thirty (30) days after the initial notice of intent to mediate. The parties agree to share equally the costs and expenses of the mediation (which shall not include the expenses incurred by each party for its own legal representation in connection with the mediation). **If the dispute has not been resolved within sixty (60) days following the initial mediation proceeding, either party may initiate litigation; provided, however, that either party may seek injunctive relief at any time.** The parties further acknowledge and agree that negotiations and mediation proceedings under this Section 30 are settlement negotiations, and that, to the extent allowed by applicable law, all offers, promises, conduct and statements, whether oral or written, made in the course of the mediation by any of the parties or their agents shall be confidential and inadmissible in any arbitration or other legal proceeding involving the parties; provided, however, that evidence which is otherwise admissible or discoverable shall not be rendered inadmissible or nondiscoverable as a result of its use in the mediation. **The provisions of this Section may be enforced by any Court of competent Jurisdiction.**

(D. 38 at ECF p. 3-4) (emphasis added). State Farm argues that because Lynx did not allege the performance of its contractual obligations, to include its compliance

8

with the mandatory dispute-resolution procedures outlined in Paragraph 30, that Count One ought to be dismissed. (D. 38 at ECF p. 8-9). Lynx responds by arguing that because its Complaint seeks "permanent injunctive relief" the "action falls squarely within the plain language of the exception in § 30." (D. 45 at ECF p. 10). According to Lynx, "[n]othing in § 30 limits the carve-out to preliminary relief or bars maintaining an action where permanent injunctive relief is pled." *Id.* Indeed, § 30 plainly states "either party may seek injunctive relief at any time." (D. 38 at ECF p. 3-4).

Under Illinois law, the starting point for the Court's interpretation of the Agreement is its language according to its "'plain and ordinary meaning.'" *Coatney v. Ancestry.com DNA, LLC*, 93 F.4th 1014, 1020 (7th Cir. 2024) (quoting *Romspen Mortg. Ltd. P'ship v. BGC Holdings LLC – Arlington Place One*, 20 F.4th 359, 372 (7th Cir. 2021). Here, the Agreement's plain language is clear: "either party may seek injunctive relief at any time." (D. 2-1 at ECF p. 18). The Court is not at liberty to deviate from the text of an Agreement that narrowly sanctions either party's right to seek "injunctive relief at any time." *Id.* But that language does not grant the Plaintiff the right to seek "monetary and other relief that goes well beyond a request for an injunction." (D. 38 at ECF p. 9); *see also* (D. 2 at ECF p. 34). To hold otherwise would mean that "any party can avoid their contractual pre-litigation obligations simply by including a request for an injunction in the prayer for relief of any complaint." (D. 38 at ECF p. 9). In the Seventh Circuit, courts routinely enforce alternative forms of dispute resolution such as the one at issue in this case. *See Omni Tech Corp. v. MPC Sols. Sales, LLC*, 432 F.3d 797, 799 (7th Cir. 2005). Thus, while the Plaintiff is correct in its view that it could seek injunctive relief at any time, State Farm is also correct in its view that the Plaintiff is limited to seeking injunctive relief by that same provision until such time as the mediation procedures outlined in Paragraph 30 of its Agreement with State Farm are

complete.² To date, those mediation procedures have not been realized.³ Therefore, as applied to this case's circumstances, the Agreement would only permit the Plaintiff to seek injunctive relief in piecemeal fashion against State Farm. The Court declines to engage in that kind of haphazard litigation and therefore stays the litigation of this case pending the resolution of the mediation procedures set forth in Paragraph 30 of the Agreement. *See Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) ("[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.")

## IV

For the reasons set forth *supra*, the Motions for Leave to File Under Seal (D. 36 & D. 39) are granted, the Sealed and Redacted Motions to Dismiss (D. 37 & D. 38) are granted and denied in part with leave to renew, and the Sealed and Redacted Motions to Dismiss (D. 40 & 41) are denied with leave to renew. The case is hereby stayed pending completion of mediation, and the parties are directed to file a status report within fourteen days of its conclusion.

*It is so ordered.*

Entered on October 14, 2025

s/Jonathan E. Hawley
U.S. DISTRICT JUDGE

---

² State Farm also alleges that the remaining Counts against it "arise out of or relate to the Agreement" and therefore also fall within the mandatory mediation procedures outlined in Paragraph 30. (D. 38 at ECF p. 4-5). Lynx did not respond to this argument. *See* (D. 45 at ECF p. 10). "Failure to respond to an argument made in a motion to dismiss results in waiver." *LeSea, Inc. v. LeSea Broadcasting Corp.*, 370 F. Supp. 3d 732, 739 (N.D. Ind. 2019). Therefore, the Court assumes without deciding that the remaining Counts fall within the mandatory dispute-resolution procedures outlined in Paragraph 30 of the Agreement.

³ State Farm claims that on August 18, 2025, "the afternoon before State Farm's deadline for filing this Motion [to Dismiss], Lynx finally sent a Notice of Dispute Under Section 30 of the Out-Tasking Agreement to the undersigned counsel." "Lynx has thus started the process. It has far from completed it. Per the Agreement, if the Parties do not negotiate a resolution within 120 days, they can proceed to mediation; and if they do not settle within 60 days of the initial mediation proceeding, either Party can initiate litigation." (D. 38 at ECF p. 8 n.4).