E-FILED
Tuesday, 14 July, 2026  09:45:21 AM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION**

| | |
|---|---|
| LYNX SERVICES, L.L.C., <br><br> Plaintiff, <br><br> v. <br><br> STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY; SAFELITE GROUP, INC.; AND SAFELITE SOLUTIONS L.L.C. <br><br> Defendants. | Civil Action No. 25-cv-1251 <br><br> Judge Jonathan E. Hawley <br> Magistrate Judge Ronald L. Hanna <br><br> EQUITABLE RELIEF IS SOUGHT AND JURY TRIAL DEMANDED |

**LYNX'S FIRST AMENDED COMPLAINT**

Plaintiff LYNX Services, L.L.C. ("LYNX") for its First Amended Complaint against State Farm Mutual Automobile Insurance Company; Safelite Group, Inc.; and Safelite Solutions L.L.C. (collectively, "Defendants"), hereby alleges as follows:

**PRELIMINARY STATEMENT**

1.      For more than nearly thirty years, LYNX administered State Farm's glass claims. Ex. F at ¶ 21.  During the latter part of this long period, State Farm obtained substantial profits by utilizing LYNX's information and pricing strategies to process its policyholders' auto glass claims. *Id.* at ¶ 56.

2.      State Farm terminated its relationship with LYNX after announcing it hired LYNX's direct competitor (Safelite) as its new third-party administrator for its glass claims, effective July 1, 2025.  *Id.* at ¶¶ 25-26.  Despite this change—and the fact that Safelite is also an auto glass repair provider itself—State Farm represented to its National Auto Glass Shop participants that "[t]here would be no changes" to State Farm's National Glass Program.  *Id.* at ¶ 26.  But for this to be true, State Farm would have to continue using LYNX's confidential and

proprietary information. State Farm represented that the program would continue without change and admitted sharing LYNX's information with Safelite.

3.     On information and belief, Safelite, through its experience competing with LYNX in this industry, knew that LYNX had compiled valuable information on glass providers through LYNX's proprietary systems and logic and availed itself of information that State Farm shared to help Safelite be a more efficient third-party administrator. Safelite's use of LYNX's confidential information and trade secrets would mean that Safelite could determine the pricing of glass service centers in a manner similar to LYNX and, as a result, State Farm would continue to save substantial amounts in indemnity costs. On information and belief, State Farm seized on this opportunity and is continuing to use—and already has or will soon share with Safelite—reports provided by LYNX, which are the result of years of compiling and verifying select information and contain LYNX's confidential information and trade secrets. State Farm is free to take its business elsewhere, but when its relationship with LYNX ends, so too must its use of LYNX's trade secrets and confidential information. State Farm's actions make clear that it rejects this fundamental fairness and that State Farm has or will imminently share LYNX's confidential information with LYNX's direct competitor, Safelite, with callous disregard towards LYNX's valuable information and its contractual obligations to LYNX. In fact, both State Farm and Safelite did not deny that State Farm shared LYNX's trade secrets and confidential information with Safelite despite LYNX giving them multiple opportunities to do so. *Id*. at ¶¶ 29-30. State Farm and Safelite's misappropriation is willful, deliberate, and done with the specific and malicious intent to steal confidential and trade secret information from LYNX, knowing that such theft will materially damage the business of LYNX and further the anti-competitive and unfair business practices of Safelite.

4.      Indeed, State Farm and Safelite both refused to return all LYNX confidential information after LYNX provided them notice of their misappropriation. This flat refusal is clear evidence of the specific and joint intent to steal LYNX's confidential information and trade secrets. Safelite's position as State Farm's third-party administrator for its glass claims, coupled with feigned ignorance and the refusal to stop using and return the LYNX information confirms that Safelite—aided and abetted by State Farm—had improperly used LYNX's information to take over for LYNX with "no changes" and further deepen its unfair and anti-competitive hold on the glass claims marketplace.

5.      Safelite already exerts immense control over the market given its dual role as both the largest third-party administrator of glass insurance claims and the largest auto glass service provider in the industry. It has a history of using exclusionary and predatory practices that unfairly disadvantage its competitors in the auto glass industry. And now, Safelite and State Farm have gained further competitive advantage over LYNX by improperly using LYNX's confidential information and trade secrets—including having had a head start in developing a competing, virtually identical Glass Program management system.

6.      Unless enjoined, this misappropriation will irreparably damage LYNX's business reputation, competitive advantage, and market share, including through an unknown loss of customers to Safelite. As a result, LYNX had no choice but to bring this action and seek injunctive relief to preserve the value of its business and trade secrets and prevent irreparable harm to its competitive position.

## PARTIES

7.      LYNX Services, L.L.C. ("Plaintiff" or "LYNX") is a limited liability company organized and existing under the laws of Kansas with its principal place of business located at

3

8900 Prominence Parkway Bldg. 100, Ste. 300, Jacksonville, FL 32256.  LYNX's sole member is Claims Services Group L.L.C., which resides in Delaware.

8.     State Farm Mutual Automobile Insurance Company ("State Farm") is a corporation organized and existing under the laws of Illinois with its principal place of business located at One State Farm Plaza, Bloomington, IL 61710.

9.     Safelite Group, Inc. is a corporation organized and existing under the laws of Delaware with its principal place of business located at 7400 Safelite Way, Columbus, OH 43235.

10.     Safelite Solutions L.L.C. is a limited liability company organized and existing under the laws of Delaware with its principal place of business located at 7400 Safelite Way, Columbus, OH 43235.  Upon information and belief, Safelite Solutions L.L.C. is a wholly owned subsidiary of Safelite Group, Inc.  Collectively, Safelite Group Inc. and Safelite Solutions, L.L.C. will be referred to hereinafter as "Safelite."

## JURISDICTION AND VENUE

11.     This civil action seeks damages, injunctive relief, and other equitable relief under Illinois state law; the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 *et seq*. ("DTSA"); and the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.* ("ITSA").

12.     This Court has original subject matter jurisdiction over this case because it presents claims arising under federal trade secret law.  This Court has supplemental jurisdiction over the other claims presented herein because they form part of the same case or controversy.  *See* 28 U.S.C. § 1367(a).

13.     This Court has personal jurisdiction over State Farm because Illinois is State Farm's state of incorporation and the state in which State Farm maintains its principal place of business.

14.     This Court has personal jurisdiction over Safelite because Safelite maintains contact with Illinois by purposefully engaging in activities in Illinois, including entering contracts

with State Farm and, upon information and belief, receiving information from State Farm, which serve as the underlying bases for Plaintiff's claims in this lawsuit.

15.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, including the execution of the contracts between State Farm and LYNX and the execution of the contract between State Farm and Safelite.  State Farm has also consented in writing to venue in this District for any action between it and LYNX arising out of or related to the State Farm Glass Claims Services Out-Tasking Agreement at issue in this case.  *See* Ex. A at § 53.

16.     The basis for filing in the Peoria Division is that Defendant State Farm resides in Bloomington, Illinois, and thus, the facts giving rise to this lawsuit occurred in McLean County. All complaints which arise from McLean County shall be filed in Peoria, Illinois.  *See* ILCD Local Rule 40.1.

## **FACTUAL BACKGROUND**

### **A.    LYNX and its Confidential Information and Trade Secrets**

17.     LYNX is a contact center solutions provider that helps businesses connect seamlessly with their customers across multiple communication channels.  LYNX specializes in delivering reliable, technology-driven customer service and claims management support.  As a leading third-party administrator of claims management services, LYNX enhances customer engagement and operational efficiency for clients within the automotive and insurance sectors.

18.     One of the services LYNX offers is its Glass Program, which is a comprehensive system for helping insurance companies manage their auto glass claims.  Through this program, LYNX contracts with insurance companies that wish to utilize LYNX's network of auto glass service provider companies.

**1.    Trade Secret A (Auto Glass Service Provider Compilation)**

19.    Trade Secret A is the compilation of profile information from auto glass service providers maintained in LYNX's METRYX® Industry Services Registry ("METRYX"). METRYX is a web-based, password-protected application hosted on LYNX's website that provides auto glass service providers the opportunity to register and maintain their capabilities in a profile. *See* Ex. F at ¶¶ 11, 13, 37.

20.    LYNX created METRYX to provide insurance, fleet, and cash customers more complete information concerning an auto glass service provider's capacity, service offerings, professional qualifications, and credentials. *Id*. at ¶ 10.  With this information, METRYX provides auto glass customers with the ability to make better informed choices based on the services offered by qualified providers.

21.    METRYX is a customized platform that LYNX developed after years of observing how auto glass service providers and the insurance industry operate and identifying ways that LYNX could improve efficiencies.  With METRYX, auto glass service providers and insurance companies can accurately represent their glass service providers' capabilities to policyholders who report a glass loss. *Id*. at ¶ 15.

22.    One benefit that METRYX provides LYNX's auto glass service providers is that the provider does not need to directly submit profile information to individual participating insurance companies to service their claims.  Instead, an auto glass service provider that wants to participate in any glass program managed by LYNX need only complete one METRYX profile. *Id*. at ¶ 13.  That same information is used for all glass programs for which the provider is enrolled and is not for the benefit of just one insurance company's glass program. *Id*. at ¶ 46.  In other words, METRYX data that LYNX collected is compiled on behalf of all of LYNX's customers.

23.     In addition to the substantial benefit and value inherent in the creation and maintenance of an industry-leading list of thousands glass providers around the country, another benefit METRYX provides is in the specific profile data fields developed using METRYX application logic during the process of creating (or updating) the auto glass provider company's profile. *Id.* at ¶ 37-45. These highly confidential and proprietary data fields are subsequently used to drive pricing decisions that have saved State Farm millions of dollars. *Id.* at ¶ 56.

24.     Importantly, these proprietary data fields, along with the remainder of the auto glass service provider's profile, are required in the METRYX system to create a complete auto glass service provider profile. *Id.* at ¶ 14. An auto glass service provider using METRYX cannot apply to be a part of a specific insurance company's glass program through LYNX until its company profile in the METRYX system is complete. *Id.* As such, the METRYX system includes a complete and proprietary compilation of glass providers that can be used to assist policyholders in contacting a qualified auto glass service provider, to expedite payments to the glass service providers, and to save insurance companies like State Farm millions of dollars in indemnity impact.

25.     The entire compilation of data that LYNX maintains about the glass service providers in METRYX is substantial, and it includes without limitation: company name, address, phone number, hours of operation, whether a mobile service is offered, the service area, the types of repairs offered, technician credentials, technician qualifications, relevant training, mobile capabilities, and related information. *Id.* at ¶¶ 14, 37. This compilation of profile information from glass service providers goes well beyond what is publicly available.

26.     Over decades, through LYNX's marketing and sales efforts, the METRYX registry grew to a compilation of thousands of high-quality, detailed profiles of glass service providers. *Id.* at ¶ 47.

**2.    Trade Secret B (Auto Glass Service Provider Service Area Information)**



29.    This proprietary compilation allows LYNX to provide competitive features for its services. For example, based upon this collection of high-quality profile data, ██████████ ████████████████████████ LYNX's proprietary and trade secret information have a substantial impact on indemnity costs, benefiting METRYX's insurance company customers. *Id*. at ¶ 56.

30.    LYNX did not develop this information specifically for State Farm. Rather, LYNX uses the logic ████████████████████████

██████ for every program it manages. *Id.* at ¶ 55. As such, all of LYNX's customers beyond State Farm benefit from the auto glass service provider service area information.

### 3.    Trade Secret C (METRYX Pricing Strategy)

31.    Trade Secret C is the pricing strategy itself. METRYX uses a specific pricing strategy (hereinafter, "METRYX Pricing Strategy") that allows specific pricing decisions to be made in a way that make the entire industry more efficient and fair. Indeed, the METRYX Pricing Strategy was a primary driver in the development of METRYX. *Id.* at ¶¶ 61-62. The METRYX Pricing Strategy was developed by LYNX as a part of the three-year development effort to change the way auto glass service providers were managed. *Id.* at ¶ 62.

32.    Prior to the launch of the METRYX Pricing Strategy, insurance pricing was based on the actual location of service centers, which incentivized centers to lower their pricing by purposely locating those service centers to rural areas adjacent to urban areas. *Id.* at ¶¶ 61-62. When LYNX launched the program in August of 2005, it was the first such combination of data and pricing methodology in the industry, and it is unique in the industry today. *Id.* at ¶ 62.

██ ████████████████████████

████████████████████████████

████████████████████████████

████████████████████████ ████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████

9

34.    Much like the METRYX database and the auto glass service provider information, the METRYX Pricing Strategy has saved State Farm millions of dollars in indemnity impact.  *Id*. at ¶ 73.

**B.    LYNX's Trade Secrets are Confidential and Proprietary**

35.     LYNX's trade secrets are confidential and proprietary. On information and belief, State Farm is also aware that LYNX considers the information it provided to State Farm under the Agreement, including the trade secrets described above, to be confidential and proprietary.

36.    For example, the METRYX information described in Trade Secrets A and B above (collectively, "LYNX Information") help LYNX establish a competitive edge in the marketplace and are part of the value LYNX provides its insurance company customers and glass service partners.  Accordingly, LYNX considers the LYNX Information to be highly confidential and treats its contents, which LYNX provides to its clients through informational reports, as critical trade secrets.  LYNX also considers the METRYX Pricing Strategy described as Trade Secret C above to be confidential information and safeguards it similarly to the LYNX Information.

37.    The LYNX Information, the related reports containing this information, and the METRYX Pricing Strategy are not generally known or readily ascertainable by the public.  LYNX does not make the LYNX Information or the METRYX Pricing Strategy accessible to the public in any way.  Instead, LYNX only provides limited access to these trade secrets to authorized insurance companies and glass service providers that enter into agreements with LYNX.

38.    With respect to auto glass service providers, LYNX provides access only to a provider's own profile through a password-protected account.  *Id*. at ¶ 14.  Even after authenticated with a password, auto glass service providers can only access their account and cannot access any of the thousands of other profiles comprising the rest of the METRYX registry.

39.     An auto glass service provider interested in creating a METRYX profile must accept METRYX's Terms and Conditions of Use.  These Terms and Conditions outline how LYNX will handle the auto glass service provider's confidential information.  Except for disclosure to third parties to audit and verify the information provided by an auto glass service provider, LYNX keeps the personal information provided by auto glass service providers in METRYX private and only shares it with third parties under limited circumstances.  Other than providing an auto glass service provider's confidential information to insurance companies LYNX has contracted with to assist that insurance company's glass claims, the only other circumstances in which LYNX may share an auto glass service provider's information are (1) if it is necessary to protect LYNX's rights or property; (2) if it is necessary for LYNX to enforce the terms of use it has entered with the auto glass service provider; (3) if LYNX is compelled by law enforcement officials or judicial authorities to provide information on individual users; or (4) if doing so is necessary for public safety.

40.     Only a small, authorized team from LYNX has access to the technician and vehicle authentication information to manage reported duplications and to facilitate verification with the appropriate agencies.  *Id*. at ¶ 48.  A similarly small team from State Farm can also access technician and vehicle information for purposes of managing the LYNX/State Farm program, pursuant to an agreement between LYNX and State Farm.

41.     LYNX only provides insurance companies access to its confidential information and trade secrets under strict terms of confidentiality governed by LYNX's agreements with these insurance companies.  *Id*. at ¶ 24.

42.     To the extent that any third parties receive LYNX Information for verification purposes, LYNX takes reasonable measures to protect this information.

11

43.     LYNX's confidential information and trade secrets can be discerned from the METRYX system, which is password protected and requires authorized users to login to access LYNX information. *Id*. at ¶ 48. LYNX also routinely performs security audits. LYNX complies with industry standards for securing its information; it is SOX compliant and ISO certified in information security. *Id.*

44.     LYNX limits the number and types of employees who can access METRYX and requires these employees to undergo special security training before receiving access to its trade secrets. *Id.*

45.     LYNX also takes procedural and technological measures to protect an auto glass service provider's information from loss, misuse, alteration, and destruction, and asks that any third party to whom LYNX may transfer an auto glass service provider's information take comparable steps to protect the security of this information.

**C.     LYNX's Agreement with State Farm**

46.     State Farm is an insurance company that requires assistance in managing certain glass claim services.

47.     LYNX has historically operated as State Farm's Glass third-party administrator vendor (TPA) pursuant to various agreements.

48.     One of the agreements State Farm entered with LYNX is titled State Farm Glass Claims Services Out-Tasking Agreement (#2000010319) (the "Agreement"). This Agreement was executed by State Farm and LYNX in June 2017 and became effective on July 1, 2017.

49.     Under the Agreement, LYNX agreed to administer State Farm glass claims for State Farm policyholders using its professional capabilities and physical assets and according to State Farm's Glass Claims Services Business Rules; State Farm's Payment Process to LYNX; and Call Center Infrastructure and Requirements. *See* Ex. A at § 2.

50.      In Section 5(a) of the Agreement, State Farm acknowledges that during performance of the Agreement, it "may learn or have access to certain confidential, . . . trade secret, proprietary or other like information or products of [LYNX] or of third parties[.]"  Ex. A at § 5(a). Under this Section, State Farm also agreed to "keep strictly confidential" LYNX's trade secrets and other confidential information.  *Id.*

51.      Furthermore, in Supplement #1 to the State Farm National Offer and Acceptance Agreement, which forms part of Attachment G to the Agreement, State Farm acknowledges LYNX's exclusive ownership of its METRYX Tool.  *See* Ex. B. Attached as Exhibit B-1 is a copy of the most recently updated version of Attachment G to the Agreement, which became effective on December 15, 2023.

52.      On June 29, 2022, State Farm and LYNX executed Amendment #5 to the Agreement, which extended the term of the Agreement, keeping it effective until July 1, 2025.  *See* Ex. C.

**D.      State Farm's Termination of the Agreement and Replacement of LYNX as its Glass TPA Vendor**

53.      State Farm issued an announcement dated March 31, 2025, to its National Auto Glass Shop Participants from its Vice President of Operations for P&C Claims, Ms. Brianne Jones. This message stated:

> Effective July 1, 2025, State Farm® will be using Safelite® Solutions as its new National Glass Program third party administrator (TPA), replacing our current Glass TPA vendor, LYNX Services. **There will be no changes to our National Glass Program**.

Ex. D.

54.      Safelite and LYNX are direct competitors.  State Farm knows this.

13

55.     On information and belief, through years of competing directly with LYNX in auto glass insurance administration, Safelite is aware that LYNX has compiled a valuable collection of verified information about auto glass service providers through LYNX's proprietary systems, that LYNX used a proprietary pricing strategy, and that State Farm had access to that information.

56.     On information and belief, Safelite knew that State Farm would view Safelite as a more attractive third-party administrator if it could use LYNX's information and strategy to save State Farm substantial amounts in indemnity costs.  As both the largest auto glass service provider and the largest third-party administrator of glass insurance claims in the industry, Safelite knew or should have known that the information State Farm furnished to it originated with LYNX, constituted LYNX's confidential information and trade secrets, and was subject to LYNX's confidentiality protections.  Safelite nonetheless accepted, retained, and used that information.

57.     On information and belief, State Farm agreed to continue using and to disclose LYNX's confidential information and trade secrets since it stood to benefit financially from Safelite's use of LYNX's data to make pricing determinations.

58.     State Farm disclosed substantial volumes of data containing proprietary LYNX Information and confidential data from reports that LYNX routinely provided State Farm during the term of the Agreement.  Specifically, State Farm shared this data with Safelite in anticipation of Safelite becoming State Farm's newest TPA.

59.     State Farm's announcement that in replacing LYNX with Safelite "[t]here will be no changes" caused LYNX grave concern about its proprietary information and trade secrets, resulting in LYNX reaching out to Mr. John Simmons of State Farm to discuss State Farm's confidentiality obligations under the Agreement.  *See* Ex. F at ¶¶ 28-29.  During this conversation, LYNX told State Farm that its announcement signaled an intent to improperly use and leverage the LYNX Information.

60.    LYNX also discussed these concerns with Mr. Eric Thomas—an attorney—at State Farm.  Surprisingly, and contrary to the parties' contracts, Mr. Thomas's response was that any LYNX Information that LYNX shared with State Farm was owned by State Farm.  Mr. Thomas and other State Farm representatives also confirmed that the LYNX Information has or will be shared without LYNX's consent.  *Id.* at ¶ 30.

61.    Upon information and belief—based in part on State Farm's prior statements about sharing data and information reflected in reports containing the LYNX's confidential information and trade secrets with Safelite and the change of State Farm's third-party administrator to Safelite on July 1, 2025—State Farm has acted in willful disregard to LYNX's trade secret information and its contractual obligations to LYNX.  On information and belief, State Farm has continued to use LYNX's trade secret and confidential information and has shared, plans to share, and/or will inevitably share LYNX's confidential, proprietary, and trade secret information with Safelite.

62.    In an effort to limit the damage from State Farm's malicious acts, LYNX also wrote to Safelite demanding that it cease and desist from its misappropriation of LYNX's trade secrets and making it clear that State Farm's unauthorized use and disclosure of LYNX's information to Safelite was improper and done without LYNX's consent.

63.    Both State Farm and Safelite have refused to return all LYNX confidential information to LYNX.

64.    State Farm's and Safelite's willful misappropriation of LYNX's trade secrets was confirmed when Safelite sent out a "new" National Offer and Acceptance Agreement to auto glass service providers.  That "new" agreement expressly includes the METRYX Pricing Strategy as a program requirement and requested that these auto glass service providers—which are customers of LYNX—sign the new agreement.

65.    Safelite's email, dated June 24, 2025, shown below, expressly acknowledged the "continued participation" in the program for recipients that do not respond to the "new" agreement, demonstrating that State Farm's "no change" statement to the industry was true and that State Farm has provided to Safelite, and Safelite is using or about to use, LYNX Information as well.



66.    Safelite's "new" National Offer and Acceptance Agreement linked in the above email, attached as Exhibit E to this Complaint, describes METRYX's Pricing Strategy in *identical* terms as the National Offer and Acceptance Agreements that LYNX signed with auto glass service providers.  Ex. E at § 3.

**COUNT I**
**BREACH OF CONTRACT—STATE FARM**

67.    Plaintiff incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

68.     State Farm and LYNX were parties to the Agreement, as well as any amendments and renewals thereto.

69.     The Agreement is a valid, binding, and enforceable written contract signed by both parties, and its terms are in full force and effect until July 1, 2025.

70.     All conditions precedent to LYNX's claims have been performed.  Specifically, after the Court's October 2025 order staying this action pending the parties' compliance with the alternative-dispute-resolution provisions of Section 30 of the Agreement, LYNX and State Farm participated in mediation on March 18, 2026, which concluded without resolving the parties' dispute.

71.     State Farm's promise to "keep strictly confidential" LYNX's confidential information and trade secrets, which includes the LYNX Information and METRYX Pricing Strategy, is a material provision of the Agreement and part of the consideration provided by State Farm in exchange for LYNX providing State Farm with its confidential and trade secret information.

72.     During the course of the Agreement, LYNX routinely provided State Farm proprietary information, allowing State Farm to save millions of dollars.  LYNX furnished this information to State Farm through routine file transfers, including monthly data exports in the form of .CSV files.

73.     On information and belief, State Farm shared substantial volumes of data containing proprietary information with LYNX's known competitor, Safelite, in preparation for Safelite to become State Farm's newest TPA.

74.     State Farm willfully breached Section 5(a) of the Agreement by intentionally disclosing LYNX's confidential information and trade secrets to LYNX's known competitor, Safelite.

17

75.     State Farm's willful breach has caused and, unless and until such breach is enjoined by this Court, will continue to cause, LYNX substantial injury, including that which is irreparable and for which LYNX has no adequate remedy at law.

## COUNT II
## UNJUST ENRICHMENT—STATE FARM

76.     Plaintiff incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

77.     State Farm received many benefits when it entered the Agreement with LYNX, including the use of LYNX's confidential information, certain of which was generated using LYNX's proprietary tools and certain of which constitute trade secrets.

78.     State Farm accepted and retained this benefit, knowing it was conferred by LYNX, and derived value from LYNX's confidential information and trade secrets including increased revenues and efficiencies in managing its policy holders' glass claims.

79.     Pursuant to the Agreement, State Farm agreed to use LYNX's confidential information for limited purposes.  State Farm also agreed not to share LYNX's confidential information with a direct competitor of LYNX.

80.     Despite this, State Farm expressed its intent to continue using LYNX's confidential information after the termination of the Agreement and to share it with Safelite, LYNX's direct competitor.

81.     On information and belief, State Farm shared substantial volumes of data containing proprietary information from the METRYX registry with LYNX's known competitor, Safelite in preparation for Safelite to become State Farm's newest TPA.

82.     State Farm is not compensating LYNX for the continued use of LYNX's confidential information.

18

83.    LYNX has not authorized State Farm's continued use of LYNX's confidential information after the termination of its relationship with State Farm under the Agreement and has not consented to it being shared with its direct competitor.

84.    State Farm's continued use of LYNX's confidential information despite LYNX's strenuous objection resulted or will result in State Farm receiving a benefit that was retained unjustly.

85.    State Farm has been unjustly enriched at LYNX's expense as a result of this conduct.

86.    State Farm's ongoing use of LYNX's confidential information caused harm and resulting detriment to LYNX.

87.    Equity and good conscience require that State Farm make restitution to LYNX in an amount equal to the benefit unjustly retained, as well as any profits derived from that benefit.

**COUNT III**
**VIOLATION OF THE DEFEND TRADE SECRETS ACT,**
**18 U.S.C. § 1836, ET SEQ. ("DTSA")—STATE FARM**

88.    Plaintiff incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

89.    LYNX owns trade secrets related to its METRYX platform and related proprietary information, which are neither provided by, obtained for, nor derived by individual insurance companies, such as State Farm.

90.    LYNX's trade secrets include the LYNX Information and the METRYX Pricing Strategy.

91.    LYNX has spent considerable time, effort, and expense in developing these trade secrets.

19

92.     LYNX's trade secrets are integral to the services it provides State Farm and its other insurance industry clients, who all use LYNX's trade secret information in interstate commerce to manage glass claims made by policyholders.

93.     LYNX has undertaken reasonable methods to maintain the secrecy of its trade secrets, including entering into confidentiality agreements with any third party with whom it shared its trade secrets. LYNX also password protects and limits the number and types of employees that can access its trade secret information.

94.     LYNX's trade secrets are not generally known to individuals or entities outside of LYNX and the third parties LYNX contracts with, who have committed to maintaining the secrecy of them.

95.     The Agreement includes strict provisions that require State Farm to maintain the confidentiality of LYNX's confidential information and trade secrets.

96.     LYNX's trade secrets derive independent economic value from not being generally known to or reasonably ascertainable by another person who could obtain such economic value from their disclosure or use.

97.     LYNX is the only entity that uses its trade secrets to facilitate delivery of reliable claims management support information to insurance companies.

98.     As part of LYNX's contractual obligations with State Farm under the Agreement, State Farm was given access to and acquired knowledge of LYNX's trade secrets for the exclusive purpose of managing its glass claims. LYNX shared its trade secrets with State Farm pursuant to the protections provided in the confidentiality provisions of the Agreement.

99.     State Farm had, and continues to have, an express duty to maintain the secrecy of LYNX's trade secrets and to limit its use of LYNX's trade secrets. State Farm also knew, or had

20

reason to know, that LYNX intended and expected that the secrecy of its trade secrets would be maintained and strictly observed.

100.    Despite having and continuing to have an express duty to maintain the secrecy of and to limit its use of LYNX's trade secrets, State Farm misappropriated LYNX's trade secrets by disclosing LYNX's trade secrets to LYNX's direct competitor, Safelite, without LYNX's consent. Furthermore, State Farm's use of LYNX's trade secrets after the termination of the Agreement is unauthorized.

101.    On information and belief, State Farm shared volumes of data containing proprietary information from the METRYX registry with LYNX's known competitor, Safelite in preparation for Safelite to become State Farm's newest TPA.  This data consists of distinct trade secret information in the form of the compiled METRYX registry information, the auto glass service provider Service Area Information, and the METRYX Pricing Strategy.  LYNX provided this data State Farm via routine reports based on State Farm's confidentiality obligations established under the Agreement.

102.    On information and belief, State Farm continues to use LYNX's trade secrets by sharing substantial volumes of data containing proprietary information from the reports LYNX provided to State Farm for years with LYNX's direct competitor, Safelite.

103.    LYNX provided State Farm with actual notice that State Farm's continued use and disclosure of LYNX's trade secrets constitutes misappropriation on May 22, 2025.

104.    With this knowledge, State Farm has not ceased from disclosing LYNX's trade secrets and continues using LYNX's trade secrets after the termination of the Agreement.

105.    LYNX's communications with State Farm's representative confirmed State Farm's disclosure of LYNX's trade secrets and State Farm's continued use of LYNX's trade secrets after Safelite became State Farm's new TPA.

21

106.    Safelite's June 24, 2025, email and the National Offer and Acceptance Agreement included in the same confirmed that State Farm disclosed LYNX's trade secrets to Safelite.

107.    State Farm's misappropriation of LYNX's trade secrets was and continues to be willful and malicious.

108.    As a result of State Farm's willful violations of the DTSA that bestowed LYNX's valuable trade secrets to LYNX's direct competitor and its TPA, LYNX has suffered, and will continue to suffer, irreparable harm.  State Farm's acts of misappropriation unfairly erase LYNX's unique ability to provide competitive benefits to METRYX's insurance company customers based on the use of LYNX's logic and collection of high-quality data.  The irreparable harm to LYNX includes the diminution of its trade secrets—which, on information and belief, Safelite used to develop a competing Glass Program management system, reputational damage and loss of goodwill in the eyes of LYNX's customers and prospective customers who previously viewed LYNX as offering a unique service, the loss of LYNX's competitive advantage in the marketplace, and the resulting diminution of LYNX's business value, all of which are unquantifiable.

109.    In light of the foregoing, LYNX is entitled to injunctive relief to prevent State Farm from further misappropriating LYNX's trade secrets.

110.    LYNX has also been damaged because of State Farm's conduct and is entitled to damages for its actual loss and any unjust enrichment to State Farm caused by State Farm's acts of misappropriation in an amount to be proven at trial.  Alternatively, in lieu of damages for actual loss and unjust enrichment, LYNX is entitled to a reasonable royalty for State Farm's unauthorized disclosure of LYNX's trade secret information.

111.    Because State Farm willfully and maliciously misappropriated LYNX's trade secrets, LYNX is entitled to exemplary damages two times the amount of the damages awarded to LYNX and an award of attorneys' fees.

## COUNT IV
## VIOLATION OF THE ILLINOIS TRADE SECRET ACT,
## 765 ILCS 1065 ("ITSA")—STATE FARM

112.    Plaintiff incorporates by reference the allegation in the preceding paragraphs as though fully set forth herein.

113.    LYNX owns trade secrets related to its METRYX platform and related proprietary tools, which are neither provided by, obtained for, nor derived by individual insurance companies, such as State Farm.

114.    LYNX's trade secrets include the LYNX Information and the METRYX Pricing Strategy.

115.    LYNX has spent considerable time, effort, and expense in developing and compiling its trade secrets.

116.    LYNX's trade secrets are integral to the services it provides State Farm and its other insurance industry clients.

117.    LYNX has undertaken reasonable steps to maintain the secrecy of its trade secrets, including entering into confidentiality agreements with any third party with whom it shared its trade secrets. LYNX also password protects and limits the number and types of employees that can access its trade secret information.

118.    LYNX's trade secrets are not generally known to individuals or entities outside of LYNX and the third parties LYNX contracts with, who have committed to maintaining the secrecy of these trade secrets.

119.    The Agreement includes strict provisions that require State Farm to maintain the confidentiality of LYNX's confidential information and trade secrets.

120. LYNX's trade secrets derive independent economic value from not being generally known to or reasonably ascertainable by another person who could obtain such economic value from their disclosure or use.

121. LYNX is the only entity that uses its trade secrets to facilitate the delivery of reliable claims management support information to insurance companies.

122. As part of LYNX's contractual obligations to State Farm under the Agreement, State Farm was given access to, and acquired knowledge of LYNX's trade secrets for the exclusive purpose of managing its glass claims. LYNX shared its trade secrets with State Farm pursuant to the protections provided in the confidentiality provisions of the Agreement.

123. State Farm had, and continues to have, an express and contractual duty to maintain the secrecy of LYNX's trade secrets and to limit its use of LYNX's trade secrets. State Farm also knew, or had reason to know, that LYNX intended and expected that the secrecy of its trade secrets would be maintained and strictly observed.

124. Despite having and continuing to have an express duty to maintain the secrecy of and to limit its use of LYNX's trade secrets, State Farm misappropriated LYNX's trade secrets by disclosing LYNX's trade secrets to LYNX's direct competitor, Safelite, without LYNX's consent. Furthermore, State Farm's use of LYNX's trade secrets after the termination of the Agreement is unauthorized.

125. On information and belief, State Farm shared volumes of data containing proprietary information from the METRYX registry with LYNX's known competitor, Safelite in preparation for Safelite to become State Farm's newest TPA. This data consists of distinct trade secret information in the form of the compiled METRYX registry information, the auto glass service provider Service Area Information, and the METRYX Pricing Strategy. LYNX provided

this data State Farm via routine reports based on State Farm's confidentiality obligations established under the Agreement.

126. On information and belief, State Farm continues to use LYNX's trade secrets by sharing substantial volumes of data containing proprietary information from the reports LYNX provided to State Farm for years with LYNX's direct competitor, Safelite.LYNX provided State Farm with actual notice that State Farm's disclosure and continued use of LYNX's trade secrets constitutes misappropriation on May 22, 2025.

127. With this knowledge, State Farm has not ceased from disclosing LYNX's trade secrets and continues using LYNX's trade secrets after the termination of the Agreement.

128. LYNX's communications with State Farm's representative confirmed State Farm's disclosure of LYNX's trade secrets to Safelite and State Farm's continued use of LYNX's trade secrets after Safelite became State Farm's new TPA.

129. Safelite's June 24, 2025, email and the National Offer and Acceptance Agreement included in the same confirmed State Farm disclosed LYNX's trade secrets to Safelite.

130. State Farm's misappropriation of LYNX's trade secrets was and continues to be willful and malicious.

131. As a result of State Farm's willful violations of the ITSA that bestowed LYNX's valuable trade secrets to LYNX's direct competitor and its TPA, LYNX has suffered, and will continue to suffer, irreparable harm. State Farm's acts of misappropriation unfairly erase LYNX's unique ability to provide competitive benefits to METRYX's insurance company customers based on the use of LYNX's logic and collection of high-quality data. The irreparable harm to LYNX includes the diminution of its trade secrets—which, on information and belief, Safelite used to develop a competing Glass Program management system, reputational damage and loss of goodwill in the eyes of LYNX's customers and prospective customers who previously viewed

LYNX as offering a unique service, and the resulting loss of LYNX's competitive advantage in the marketplace and diminution of LYNX's business value, all of which are unquantifiable.

132.    In light of the foregoing, LYNX is entitled to injunctive relief to prevent State Farm from further misappropriating LYNX's trade secrets.

133.    LYNX has also been damaged because of State Farm's conduct and is entitled to damages for its actual loss and any unjust enrichment to State Farm caused by State Farm's acts of misappropriation in an amount to be proven at trial.  Alternatively, in lieu of damages for actual loss and unjust enrichment, LYNX is entitled to a reasonable royalty for State Farm's unauthorized disclosure of LYNX's trade secrets.

134.    Because State Farm willfully and maliciously misappropriated LYNX's trade secrets, LYNX is entitled to exemplary damages two times the amount of the damages awarded to LYNX and an award of attorneys' fees.

**COUNT V**
**VIOLATION OF THE DEFEND TRADE SECRETS ACT,**
**18 U.S.C. § 1836, ET SEQ. —SAFELITE**

135.    Plaintiff incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

136.    LYNX owns trade secrets related to its METRYX platform and related proprietary information, which are neither provided by, obtained for, nor derived by insurance companies, such as State Farm.

137.    LYNX's trade secrets include the LYNX Information and the METRYX Pricing Strategy.

138.    LYNX has spent considerable time, effort, and expense in developing and compiling its trade secrets.

26

139.    LYNX's trade secrets are integral to the services it provides State Farm and its other insurance industry clients, who use LYNX's trade secrets in interstate commerce to manage glass claims made by policyholders.

140.    LYNX has undertaken reasonable steps to maintain the secrecy of its trade secrets, including entering into confidentiality agreements with any third party with whom it shared its trade secret information. LYNX also password protects and limits the number and types of employees that can access its trade secret information.

141.    LYNX's trade secrets are not generally known to individuals or entities outside of LYNX and the third party's LYNX contracts with, who have committed to maintaining the secrecy of such information.

142.    LYNX's trade secrets derive independent economic value from not being generally known to or reasonably ascertainable by another person who could obtain such economic value from their disclosure or use.

143.    LYNX is the only entity that uses its trade secretsto facilitate the delivery of reliable, claims management support information to insurance companies.

144.    As part of LYNX's contractual obligations with State Farm under the Agreement, State Farm was given access to, and acquired knowledge of LYNX's trade secrets for the exclusive purpose of managing its glass claims.  LYNX shared its trade secrets with State Farm pursuant to the protections provided in the confidentiality provisions of the Agreement.

145.    Upon information and belief, Safelite has entered a contract with State Farm under which Safelite became State Farm's new National Glass Program third-party administrator on July 1, 2025.

146.    Safelite and LYNX are direct competitors.

147.    Safelite is aware that it replaced LYNX, its direct competitor, as State Farm's Glass TPA vendor.

148.    On information and belief, Safelite, through its experience competing with LYNX in this industry, knew that the METRYX Pricing Strategy and LYNX Information would make it a more efficient third-party administrator for State Farm and asked or at least suggested to State Farm to share LYNX's trade secrets with it.

149.    LYNX has not entered into a contract with Safelite.

150.    On information and belief, State Farm shared substantial volumes of data containing proprietary information from the METRYX registry with Safelite. This information consists of distinct trade secret information in the form of the compiled METRYX registry information, the auto glass service provider Service Area Information, and the METRYX Pricing Strategy. State Farm shared LYNX's trade secrets to aid Safelite in the transition of becoming State Farm's newest TPA. Safelite improperly obtained access to these trade secrets without permission from LYNX and in knowing violation of State Farm's express duty of confidentiality.

151.    On information and belief, Safelite continues to use LYNX's trade secrets by incorporating the data containing proprietary information LYNX provided to State Farm for years in its role as TPA. Despite having and continuing to have an express duty to maintain the secrecy of and to limit its use of LYNX's trade secrets, State Farm disclosed LYNX's trade secrets to Safelite and continued using LYNX's trade secrets after Safelite became its new TPA.

152.    Safelite improperly acquired LYNX's trade secrets from State Farm, which owed a duty to LYNX to maintain their secrecy.

153.    Given the nature of LYNX's trade secrets, and its experience with entering into TPA service contracts with insurance companies that typically contain strict confidentiality provisions, Safelite knew, or had reason to know, that LYNX intended and expected that its trade

28

secrets remain secret, especially from its competitors.  At the very least, LYNX provided Safelite with actual notice that Safelite's improper acquisition and use of LYNX's trade secrets constitutes misappropriation on May 22, 2025, but, on information and belief, Safelite proceeded to misappropriate LYNX's trade secrets.

154.    Safelite has misappropriated LYNX's trade secrets by acquiring them from State Farm through improper means and using LYNX's trade secrets without LYNX's consent, including through use in its "new" National Offer and Acceptance Agreement sent to auto glass service providers.

155.    Despite knowing that it acquired LYNX's trade secrets by improper means from State Farm, Safelite has refused LYNX's demand requesting that Safelite certify it has destroyed any and all of LYNX's trade secrets in its possession and to certify that Safelite has not used LYNX's trade secrets.

156.    Safelite also did not deny that it received LYNX's trade secrets when asked by LYNX to respond unequivocally whether it received LYNX's monthly reports containing LYNX's trade secret information from State Farm.

157.    On information and belief, including Safelite's June 24, 2025 email to auto glass service providers and the accompanying agreement, Safelite's refusal to deny that it has received LYNX's reports containing trade secret information from State Farm, the July 1, 2025 transition date, and the intent for Safelite to take over as State Farm's TPA with "no changes," Safelite used LYNX's trade secrets to develop a competing Glass Program management system and/or update its own database of service providers so that it can assume LYNX's role within State Farm's National Glass Program seamlessly.

158.    Safelite's June 24, 2025 email and the National Offer and Acceptance Agreement included in the same confirmed State Farm disclosed the METRYX Pricing Strategy to Safelite.

159.  Safelite's misappropriation of LYNX's trade secrets was and continues to be willful and malicious.

160.  By leveraging LYNX's trade secrets, Safelite has reinforced its monopolistic position in the market through exclusionary and predatory practices that unfairly disadvantage competitors.  These actions, if not immediately rectified, contribute to a broader pattern of exclusionary practices by Safelite that stifle industry competition, restrict consumer choice, and improperly leverage a competitor's confidential information and trade secrets to consolidate undue market control.

161.  As a result of Safelite's willful violations of the DTSA, LYNX has suffered, and will continue to suffer, irreparable harm.  Safelite's acts of misappropriation erase LYNX's unique ability to provide competitive benefits of METRYX to its insurance company customers based on the use of LYNX's collection of high-quality data.  The irreparable harm to LYNX includes the diminution of its trade secrets, reputational damage and loss of goodwill in the eyes of LYNX's customers and prospective customers who previously viewed LYNX as offering a unique service, the loss of LYNX's competitive advantage in the marketplace, the loss of customers to Safelite, and the resulting diminution of LYNX's business value, all of which are unquantifiable.

162.  In light of the foregoing, LYNX is entitled to injunctive relief to prevent Safelite from further misappropriating LYNX's trade secrets.

163.  LYNX has also been damaged because of Safelite's conduct and is entitled to damages for its actual loss and any unjust enrichment to Safelite caused by Safelite's acts of misappropriation in an amount to be proven at trial.  Alternatively, in lieu of damages for actual loss, LYNX is entitled to a reasonable royalty for Safelite's unauthorized use of LYNX's trade secrets.

164.    Because Safelite willfully and maliciously misappropriated LYNX's trade secrets, LYNX is entitled to exemplary damages two times the amount of the damages awarded to LYNX and an award of attorneys' fees.

## COUNT VI
## VIOLATION OF THE ILLINOIS TRADE SECRET ACT, 765 ILCS 1065—SAFELITE

165.    Plaintiff incorporates by reference the allegation in the preceding paragraphs as though fully set forth herein.

166.    LYNX owns trade secrets related to its METRYX platform and related proprietary tools, which are neither provided by, obtained for, nor derived by individual insurance companies, such as State Farm.

167.    LYNX's trade secrets include the LYNX Information and the METRYX Pricing Strategy.

168.    LYNX has spent considerable time, effort, and expense in developing and compiling its trade secrets.

169.    LYNX's trade secrets are integral to the services it provides State Farm and its other insurance industry clients.

170.    LYNX has undertaken reasonable methods to maintain the secrecy of its trade secrets, including entering into confidentiality agreements with any third party with whom it shared its trade secrets. LYNX also password protects and limits the number and types of employees that can access its trade secret information.

171.    LYNX's trade secrets are not generally known to individuals or entities outside of LYNX and the third parties LYNX contracts with who have committed to maintaining the secrecy of such information.

31

172. LYNX's trade secrets derive independent economic value from not being generally known to or reasonably ascertainable by another person who could obtain such economic value from their disclosure or use.

173. LYNX is the only entity that uses its trade secrets to facilitate the delivery of reliable, claims management support information to insurance companies.

174. As part of LYNX's contractual obligations to State Farm under the Agreement, State Farm was given access to and acquired knowledge of LYNX's trade secrets for the exclusive purpose of managing its glass claims. LYNX shared its trade secrets with State Farm pursuant to the protections provided in the confidentiality provisions of the Agreement.

175. Upon information and belief, Safelite has entered a contract with State Farm under which Safelite became State Farm's new National Glass Program third-party administrator on July 1, 2025.

176. Safelite and LYNX are direct competitors.

177. Safelite is aware that it replaced LYNX, its direct competitor, as State Farm's Glass TPA vendor.

178. On information and belief, Safelite, through its experience competing with LYNX in this industry, knew that the METRYX Pricing Strategy and LYNX Information would make it a more efficient third-party administrator for State Farm and asked or at least suggested to State Farm to share that information with it.

179. LYNX has not entered a contract with Safelite.

180. On information and belief, State Farm shared substantial volumes of data containing proprietary information from the METRYX registry with Safelite. This information consists of distinct trade secret information in the form of the compiled METRYX registry information, the auto glass service provider Service Area Information, and the METRYX Pricing

Strategy. State Farm shared LYNX's trade secrets to aid Safelite in the transition of becoming State Farm's newest TPA. Safelite improperly obtained access to these trade secrets without permission from LYNX and in knowing violation of State Farm's express duty of confidentiality.

181. On information and belief, Safelite continues to use LYNX's trade secrets by incorporating the data containing proprietary information LYNX provided to State Farm for years in its role as TPA.Despite having and continuing to have an express duty to maintain the secrecy of LYNX's trade secrets and to limit its use of LYNX's trade secrets, State Farm disclosed LYNX's trade secrets to Safelite. State Farm also continued using LYNX's trade secrets after Safelite became its new TPA.

182. Safelite improperly acquired LYNX's trade secrets from State Farm, which owned a duty to LYNX to maintain their secrecy.

183. Given the nature of LYNX's trade secrets, and its experience with entering into TPA service contracts with insurance companies that typically contain strict confidentiality provisions, Safelite knew, or had reason to know, that LYNX intended and expected that its trade secrets remain secret, especially from its competitors. LYNX provided Safelite with actual notice that Safelite's acquisition and use of LYNX's trade secrets by improper means constitutes misappropriation on May 22, 2025, but, on information and belief, Safelite proceeded to misappropriate LYNX's trade secrets.

184. Safelite has misappropriated LYNX's trade secrets by acquiring them from State Farm through improper means and using LYNX's trade secrets without LYNX's consent, including through use in its "new" National Offer and Acceptance Agreement sent to auto glass service providers.

185. Despite knowing it acquired LYNX's trade secrets by improper means from State Farm, Safelite has refused LYNX's demand requesting that Safelite certify that it has destroyed

any and all of LYNX trade secrets in Safelite's possession and to certify that Safelite has not used LYNX's trade secrets.

186. Safelite also did not deny that it received LYNX's trade secrets when asked by LYNX to respond unequivocally whether it received LYNX's monthly reports containing LYNX's trade secret information from State Farm.

187. On information and belief, including Safelite's June 24, 2025 email to auto glass service providers and the accompanying agreement, Safelite's refusal to deny that it has received LYNX's reports containing trade secret information from State Farm, the July 1, 2025 transition date, and the intent for Safelite to take over as State Farm's TPA with "no changes," Safelite used LYNX's trade secrets to develop a competing Glass Program management system and/or to update its own database of service providers so that it can assume LYNX's role within State Farm's National Glass Program seamlessly.

188. Safelite's June 24, 2025 email and the National Offer and Acceptance Agreement included in the same confirmed State Farm disclosed the METRYX Pricing Strategy to Safelite.

189. Safelite's misappropriation of LYNX's trade secrets was and continues to be willful and malicious.

190. By leveraging LYNX's trade secrets, Safelite has reinforced its monopolistic position in the market through exclusionary and predatory practices that unfairly disadvantage competitors. These actions, if not immediately rectified, contribute to a broader pattern of exclusionary practices by Safelite that stifle industry competition, restrict consumer choice, and improperly leverage a competitor's confidential information and trade secrets to consolidate undue market control.

191. As a result of Safelite's willful violations of the ITSA, LYNX has suffered, and will continue to suffer, irreparable harm. Safelite's acts of misappropriation erase LYNX's unique

ability to provide competitive benefits of METRYX to its insurance company customers based on the use of LYNX's collection of high-quality data. The irreparable harm to LYNX includes the diminution of its trade secrets, reputational damage and loss of goodwill in the eyes of LYNX's customers and prospective customers who previously viewed LYNX as offering a unique service, the loss of LYNX's competitive advantage in the marketplace, the loss of customers to Safelite, and the resulting diminution of LYNX's business value, all of which are unquantifiable.

192. In light of the foregoing, LYNX is entitled to injunctive relief to prevent Safelite from further misappropriating LYNX's trade secrets.

193. LYNX has also been damaged as a result of Safelite's conduct and is entitled to damages for its actual loss and any unjust enrichment to Safelite caused by Safelite's acts of misappropriation in an amount to be proven at trial. Alternatively, in lieu of damages for actual loss, LYNX is entitled to a reasonable royalty for Safelite's unauthorized use of LYNX's trade secrets.

194. Because Safelite willfully and maliciously misappropriated LYNX's trade secrets, LYNX is entitled to exemplary damages two times the amount of the damages awarded to LYNX and an award of attorneys' fees.

**COUNT VII**
**UNFAIR COMPETITION UNDER ILLINOIS COMMON LAW—SAFELITE**

195. Plaintiff incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

196. As described above, LYNX develops and maintains confidential information and trade secrets, certain of which is developed through LYNX's propriety tools and logic.

197. Safelite was not authorized to acquire or use LYNX's confidential information and trade secrets for any purpose. Despite this, Safelite is using LYNX's trade secrets to directly

compete with LYNX's ability to manage glass claims for its insurance clients. On information and belief, Safelite used LYNX's trade secrets to develop a competing Glass Program management system and/or update its own database of service providers so that it can assume LYNX's role within State Farm's National Glass Program seamlessly.

198. Safelite's improper use of LYNX's confidential information and trade secrets was and is without Plaintiff's consent.

199. Safelite's improper use of LYNX's confidential information and trade secrets while being affiliated with State Farm is dishonest and unethical.

200. Safelite's unlawful acts, which were committed and continue to be committed with knowledge of LYNX's rights, are knowing, willful, and done in bad faith.

201. By leveraging LYNX's confidential information and trade secrets, Safelite has reinforced its monopolistic position in the market through exclusionary and predatory practices that unfairly disadvantage competitors. These actions, if not immediately rectified, contribute to a broader pattern of exclusionary practices by Safelite that stifle industry competition, restrict consumer choice, and improperly leverage a competitor's confidential information and trade secrets to consolidate undue market control.

202. Safelite's acts have caused, and unless and until such acts are enjoined by this Court, will continue to cause, great harm and irreparable injury to LYNX for which LYNX has no adequate remedy at law. The irreparable harm to LYNX includes the diminution of its trade secrets, reputational damage and loss of goodwill in the eyes of LYNX's customers and prospective customers who previously viewed LYNX as offering a unique service, the loss of LYNX's competitive advantage in the marketplace, the loss of customers to Safelite, and the resulting diminution of LYNX's business value.

203.    In light of the foregoing, LYNX is entitled to injunctive relief prohibiting Safelite from using LYNX's confidential information and trade secrets to compete with LYNX.

204.    Upon information and belief, Safelite has realized profits, gains, and advantages from its unlawful actions and use of LYNX's confidential information and trade secrets by improper means and has also caused LYNX monetary damages in an amount presently unknown but to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court grant Plaintiff the following relief:

A. A judgment in favor of Plaintiff that State Farm has breached its contractual obligations to LYNX under Section 5(a) of the Agreement;

B. A judgment in favor of Plaintiff that State Farm retained an unjust benefit from disclosure and continued to use LYNX's confidential information after terminating the Agreement with LYNX, and an award of the following relief: (1) restitution in an amount equal to the benefit State Farm unjustly received, (2) disgorgement of any profits derived from the improper use or retention of the benefit received from using LYNX's confidential information; and (3) imposition of a constructive trust over any property or funds traceable to the benefit State Farm unjustly retained;

C. A judgment in favor of Plaintiff that Defendants misappropriated LYNX's trade secrets in violation of the Defend Trade Secrets Act, and award all relief available under this Act;

D. A judgment in favor of Plaintiff that Defendants misappropriated LYNX's trade secrets in violation of the Illinois Trade Secrets Act, and award all relief available under this Act;

E. During the pendency of this action, a preliminary injunction ordering State Farm, its affiliates, employees, agents, officers, directors, attorneys, successors, and assigns, and all those acting on its behalf to take all steps necessary to prevent further disclosure and unauthorized use of LYNX's trade secrets and confidential information;

F. During the pendency of this action, a preliminary injunction ordering Safelite, its affiliates, employees, agents, officers, directors, attorneys, successors, and assigns, and all those acting on its behalf to stop using LYNX's trade secrets and confidential information;

G. A permanent injunction ordering State Farm, its affiliates, employees, agents, officers, directors, attorneys, successors, and assigns, and all those acting on its behalf to cease directly or indirectly misappropriating LYNX's trade secrets and confidential information;

H. A permanent injunction ordering Safelite, its affiliates, employees, agents, officers, directors, attorneys, successors, and assigns, and all those acting on its behalf to cease directly or indirectly misappropriating LYNX's trade secrets and confidential information;

I. In the alternative, in the event that the Court finds exceptional circumstances that render an injunction inequitable, an order that conditions future acquisition and/or use of LYNX's trade secrets and confidential information upon payment of a reasonable royalty to Plaintiff;

J. An order requiring Defendants to pay Plaintiff its damages, costs, expenses, pre-judgment and post-judgment interest for Defendants' improper acts;

K. An order requiring Defendants to pay Plaintiff exemplary damages as authorized by law;

L. An order requiring Defendants to pay Plaintiff's reasonable attorneys' fees as authorized by law; and

M. Any and all other relief as the Court may deem appropriate and just under the circumstances.

## **JURY DEMAND**

Plaintiff demands a jury trial on all issues so triable.

Dated: June 26, 2026      FISH & RICHARDSON P.C.


By: /s/ *Louis E. Fogel*
   Louis E. Fogel
   fogel@fr.com
   150 N. Riverside Plaza, Suite 2820
   Chicago, IL 60606
   Telephone: (312) 278-2601

   John S. Goetz
   goetz@fr.com
   Michael T. Zoppo
   zoppo@fr.com
   Vivian Cheng
   cheng@fr.com
   7 Times Square, 20th Floor
   New York, NY 10036
   Telephone: (212) 765-5070
   Facsimile: (212) 285-2291

   Neil J. McNabnay, *pending pro hac vice*
   mcnabnay@fr.com
   David B. Conrad
   conrad@fr.com
   Michael R. Ellis
   ellis@fr.com
   1717 Main Street, Suite 5000
   Dallas, Texas 75201
   Telephone: (214) 747-5070
   Facsimile: (214) 747-2091

   Taylor Burgener
   burgener@fr.com
   1000 Maine Ave. SW, Suite 1000
   Washington, D.C. 20024
   Telephone: (202) 626-6376
   Facsimile: (214) 783-2331

   **COUNSEL FOR PLAINTIFF**
   **LYNX SERVICES, L.L.C.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document was served via CM/ECF on July 14, 2026, upon all counsel of record.

/s/ *Louis E. Fogel*
Louis E. Fogel