E-FILED
Tuesday, 14 July, 2026  09:45:21 AM
Clerk, U.S. District Court, ILCD

# EXHIBIT A

#2000010319

## STATE FARM GLASS CLAIMS SERVICES OUT-TASKING AGREEMENT

This is a Glass Claims Services Out-Tasking Agreement, (the "Agreement") between LYNX Services, L.L.C. ("LYNX") located at 6351 Bayshore Road, Suite 18, Fort Myers, FL 33917, ("LYNX"") and State Farm Mutual Automobile Insurance Company, on behalf of itself, its subsidiaries and affiliates ("STATE FARM"), and located at One STATE FARM Plaza, Bloomington, Illinois, 61710.

### RECITALS

WHEREAS, STATE FARM and LYNX are currently performing under the STATE FARM GLASS CLAIMS SERVICES OUT-TASKING AGREEMENT #1000124925 and both parties wish to terminate that agreement and execute this Agreement to supersede it and take its place; and

WHEREAS, from time to time, STATE FARM requires assistance managing, and not reselling, certain glass claims services to be performed by LYNX, including, but not limited to, the outsourcing of glass-only claims that are filed in the United States under polices insuring motorized vehicles and other policies insuring recreational vehicles and customized vans and other policies insuring motor vehicles, except in any state in which the O&A Program (defined below) or the performance of this Agreement may be restricted by law, (hereinafter referred to "Glass Claims"); and

WHEREAS, such Glass Claims do not include any glass claims by third party claimants; and

WHEREAS, STATE FARM requires such services from LYNX to administer the STATE FARM National Offer and Acceptance Program ("O&A Program") according to the STATE FARM National Offer and Acceptance Agreement which is incorporated herein as Attachment G; and

WHEREAS, GTS Services, LLC ("GTS") is a provider of certain software and technology used in the automotive glass industry, including the LX Online and GlasPacLX (Auto Professional Version) software (the "GTS Software") and STATE FARM desires to license, access, and use the GTS Software in connection with the O&A Program; and

WHEREAS, LYNX has agreed to provide, from time to time as requested by STATE FARM, any of such services described below in Section 2 (the "Services"), and to license to STATE FARM during the Term of this Agreement the GTS Software at no cost, the terms of which are attached hereto and incorporated herein as Attachment J GTS Sub-License.

NOW THEREFORE, the parties agree as follows:

1.     EFFECTIVE DATE/TERMINATION OF CURRENT AGREEMENT. This Agreement shall become effective on July 1, 2017 ("Effective Date") upon authorized signatures of the two parties to this Agreement below and shall remain in effect until July 1, 2022 (the "Term") unless terminated in accordance with the terms of Section 29.The State Farm Glass Claims Services Out-Tasking Agreement #1000124925 shall simultaneously terminate upon this Agreement becoming effective.

2.     SERVICES / COMPENSATION. LYNX shall perform the following Services under the terms and conditions of this Agreement.

(CL Form 9400, rev. 02/06)        -1-

#2000010319

a.LYNX will administer STATE FARM Glass Claims for STATE FARM policyholders ("Services") using its professional capabilities and physical assets to execute according to;

1. Attachment A, Glass Claims Services Business Rules ("Business Rules");
2. Attachment B, STATE FARM Payment Process to LYNX
3. Attachment C, Call Center Infrastructure and Requirements. Each of which is attached hereto and incorporated herein.

The Services are to be performed at locations owned or contracted by LYNX for the purpose of fulfilling LYNX's obligations, in helping to manage Glass Claims, and as set forth in the Agreement and Attachments. LYNX will facilitate payments to Glass Companies and Non-O&A Glass Companies (defined below) according to Attachment B, STATE FARM Payment Process to LYNX, attached hereto and incorporated herein.

b. LYNX will provide the Services on an ongoing basis during the Term of this Agreement for the Administrative Fee and STATE FARM shall purchase the Services in accordance with Attachment H, Compensation, attached hereto and incorporated herein. Unless otherwise stated in an Attachment, STATE FARM will issue payment for all undisputed fee amounts upon receipt of a complete and accurate invoice from LYNX.

c. LYNX is responsible for accounting to STATE FARM for all payments made by LYNX on behalf of STATE FARM to Glass Companies that have executed an O&A Agreement with STATE FARM ("Glass Companies") and in aggregate all Non-O&A glass companies ("Non-O&A Glass Companies") that perform jobs for STATE FARM policyholders and for sending those Glass Companies or Non-O&A Glass Companies the required Internal Revenue 1099 federal tax forms, or their equivalent. LYNX will also be responsible for auditing invoices to identify errors on manual and electronic billing submitted by Glass Companies or Non-O&A Glass Companies and for advising the Glass Companies or Non-O&A Glass Companies of such errors in accordance with Attachment F, Data and Audit Procedures, attached hereto and incorporated herein.

d. LYNX will maintain electronic records of all transactions involving STATE FARM policyholders and Glass Claims until turned over to STATE FARM at the time of invoice, or earlier if requested by STATE FARM, except for competitive bid information. Competitive bid information will be electronically transferred at least once per month, unless otherwise requested by STATE FARM.

3. GTS SOFTWARE. LYNX will use its commercially reasonable efforts to cause GTS to provide STATE FARM access to and use of the GTS Software, including the NAGS® database pursuant to the terms attached hereto as Attachment J, Sub-license, (the "Sub-license"). LYNX represents and warrants that it has the authority from GTS to enter into the Sub-License.

5. CONFIDENTIALITY.

a. The parties expressly acknowledge that in the course of their performance hereunder, they may learn or have access to certain confidential, patent, copyright, business, trade secret, proprietary or other like information or products of the other party or of third parties, (for example, the other party's vendors, suppliers or customers), including but not limited to: Personal Data (as defined in the Direct Damages for Security Breach section of this Agreement); and other data such as date of birth, phone numbers, email addresses, and hash digests of any identifying data (collectively, the "Information"). Anything in this Agreement to the

(CL Form 9400, rev. 02/06)                              -2-

#2000010319

contrary notwithstanding, the parties expressly agree that they will keep strictly confidential any such information."STATE FARM Information" means Information of STATE FARM and its third parties.  LYNX Information shall include information of LYNX, its affiliates and its third parties.

· b.  STATE FARM and LYNX agree that, for the purposes of this Agreement, third parties whose duties for STATE FARM, or as a subcontractor for LYNX in performing LYNX's duties under this Agreement, require access to the information provided under this Agreement shall have access to the information as required by such duties, provided that: (i) such third parties have agreed in writing with either STATE FARM or LYNX in terms no less protective than the confidentiality obligations of this Agreement, to keep confidential the information; (ii) such third parties have agreed in writing with either STATE FARM or LYNX not to use the information for their own benefit or the benefit of any person or entity besides STATE FARM; and (iii), when allowing such third parties access to  information, will not exceed the license or use restrictions in the Agreement.

c. Except as set forth in this Agreement LYNX agrees not to use STATE FARM Information, including but not limited to Personal Data, for its own benefit or the benefit of any person besides STATE FARM.

d. The term "Disclosing Party" shall refer to the party to this Agreement providing the information to the other party.  The term "Receiving Party" shall refer to the party receiving the information in the course of its performance under this Agreement.  The term "Information" shall not include products or information that (i) are in the public domain or in the possession of the Receiving Party without restriction at the time of receipt under this Agreement; (ii) are used or released with the prior written approval of the Disclosing Party; (iii) are independently developed by the Receiving Party.

· e. It shall not be a violation of this Confidentiality section for the Receiving Party to disclose Information if a court of competent jurisdiction or appropriate regulatory authority demands such disclosure.  In such case, prior to disclosing the information, the Receiving Party will (i) notify the Disclosing Party immediately and (ii) cooperate with the Disclosing Party in asserting a confidential or protective status for the information.

f. Each party expressly further agrees that, at the sole discretion and request of the Disclosing Party, it shall return to the Disclosing Party or destroy any such information, including but not limited to Personal Data, and copies thereof, and it will certify any such destruction in writing to the Disclosing Party except that it may retain a copy as required by law.

g. Each party agrees to provide prompt written notice to the other if it becomes aware of any use or disclosure of the information, including but not limited to Personal Data, in a manner inconsistent with the requirements of this Agreement.

h. The parties to this Agreement agree that they will not disclose to any third party the pricing or fees payable to LYNX under this Agreement, except for those third parties performing duties for STATE FARM under this Agreement that may require access to such pricing or fees payable to LYNX, but such third parties must not be a competitor of LYNX as determined by LYNX and must have agreed to confidentiality provisions no less protective than those in this Agreement.  STATE FARM will provide advance written notice to LYNX to identify third parties to whom STATE FARM wishes to provide access to such LYNX pricing and fees. Except as otherwise stated in this Section 5(h), STATE FARM will not disclose to any third party the Administrative Fees payable to LYNX under this Agreement, except when ordered to be produced by a court

(CL Form 9400, rev. 02/06)                   -3-

#2000010319

of competent jurisdiction or appropriate regulatory authority and STATE FARM will notify LYNX immediately of any such request.

6.    RETENTION AND DESTRUCTION OF STATE FARM INFORMATION

a.    During the term of this Agreement and/or any Work Order, or after termination of the Agreement and/or any Work Order, LYNX shall not destroy any STATE FARM Information and/or STATE FARM third party Information, until STATE FARM directs it either: (i) to destroy STATE FARM Information in accordance with Section 6(c) below (including all copies thereof), in which case UPON State Farm's request, LYNX will certify to STATE FARM in writing that it has done so; or (ii) to return STATE FARM Information to STATE FARM and then destroy any remaining copies thereof in accordance with section (c) below, in which case LYNX will certify to STATE FARM in writing that it has done so.

b.    In the event of a regulatory, administrative or litigation-related request for STATE FARM Information and/or STATE FARM third party Information retained by LYNX, LYNX agrees to fully cooperate with STATE FARM at State Farm's expense for the production of STATE FARM Information to the extent it has not already been destroyed in accordance with the terms of the Agreement in a timely manner.

c.    Except as otherwise set forth in this Agreement, LYNX shall destroy STATE FARM Information (including all copies thereof) from the informational assets of LYNX and any applicable subcontractors, including, but not limited to, all servers, networks, devices, workstations, removable media, mobile devices, hard copy, disk drives, solid state drives, data backup tapes, peripheral storage devices, non-volatile memory modules, key material (including but not limited to all secret keys, private keys, and key pairs), log-in credentials, passwords, and virtual servers and machines that contain the STATE FARM Information. Any such destruction performed by LYNX shall meet industry practices to render information permanently illegible, including, but not limited to, DOD 5200.xx certified multi-pass overwriting utilities or physical destruction of the STATE FARM Information and/or informational asset, if other methods are not sufficient or practical to render information permanently illegible.

d.    Subject to Section 20. SECURITY, LYNX may keep STATE FARM Information limited to specific vehicle damage or proposed nature of repairs and replacements, but shall de-identify such Information by deleting any STATE FARM: (i) Personal Data or other Information that would identify a STATE FARM customer in any way (including but not limited to claim number, policy number, name, address, phone number, date of birth, or social security number of vehicle owner, software-generated identifiers (such as Apple's Identifier for Advertising, or unique IDs store in browser cookies), "fingerprint" identifiers (associated with a device, browser or operating system), network identifiers (such as IP Address), phone numbers, email addresses, or digests of any of the foregoing data), (ii) information that may identify STATE FARM, (iii) information that may identify a third party acting on behalf of STATE FARM, and (iv) the name and location of all estimators, claim representatives and repair facilities. LYNX expressly warrants that once such data is anonymized or de-identified, LYNX will not attempt to re-identify such data or re-associated such data with STATE FARM, LYNX shall only use such aggregated data for the sole purpose of providing de-identified industry data, benchmark information, analytics, trending and product development. LYNX agrees to ensure by contract that any third party to which it provides such aggregated data shall not attempt to: (i) re-identify such data; or (ii) use such data for marketing purposes.

7.    PERFORMANCE STANDARDS/QUALIFICATIONS. LYNX represents and warrants that it has the ability and expertise to perform its responsibilities hereunder and will do so with the highest standards of

#2000010319

professional workmanship. LYNX represents and warrants that it has the capability to administer and coordinate the scheduling and processing of motor vehicle glass repair and replacement between insured customers and Glass Companies and Non-O&A Glass Companies throughout the territory of the United States. STATE FARM shall have the right at any time to reject any of LYNX employees or any subcontractor employees whose qualifications, in STATE FARM's judgment, do not meet the standards hereunder. LYNX agrees that STATE FARM may at any time and for any reason, other than an unlawful reason, terminate the assignment on work involving STATE FARM of any individual employee, or of a subcontractor employee.

## 8.    BACKGROUND CHECKS/RESTRICTIONS

a.    LYNX agrees that prior to providing its Personnel to STATE FARM under this Agreement, it will complete an appropriate background check, all as allowed by any applicable law, going back to age eighteen (18) including, (i) a search of national (if applicable), federal, state, and county (or its equivalent) levels for convictions and pretrial diversion programs for felonies and misdemeanors for all residential and employment addresses disclosed by the individual or discovered by LYNX; and (ii) an employment history for all employers of the Personnel for the past ten (10) years.

b.    LYNX also will maintain a program to provide reasonable assurance that LYNX continues to comply with the requirements of this section.

c.    Such background check shall also include:

(i)    A prohibited parties search, including OFAC, the Terrorist Watch List, Specially Designated Nationals List, and Blocked Persons List;

(ii)    If the Personnel will be providing Services to State Farm Bank Mortgage Loan Services area, an FBI fingerprint background check.

d.    In no event will LYNX, in the performance of this Agreement, use the services of any Personnel who have been convicted of, or agreed to enter into a pretrial diversion or similar program in connection with a felony or misdemeanor crime or offense involving:

(i)    Dishonesty,
(ii)    Breach of trust,
(iii)    Money laundering, or
(iv)    Illegal manufacture, sale, distribution of, or trafficking in a controlled substance.

e.    If any Personnel have one of the above convictions or has entered a pretrial diversion program for any of the offenses listed in subsection d, or if any Personnel fail to meet LYNX's requirements for under subsection c., LYNX shall not assign any such Personnel to perform Services hereunder, shall remove and replace any such Personnel from the STATE FARM account and the provision of Services hereunder, and shall prohibit such Personnel's physical and/or remote access to STATE FARM Information, assets, facilities, and systems.

f.    LYNX shall maintain a process to require Personnel to disclose to LYNX, on at least an annual basis, the existence of any criminal convictions.

(CL Form 9400, rev. 02/06)            -5-

#2000010319

g.      LYNX requires time to implement this provision and will have the Background Check requirments in place and implemented by 01/01/2018.

9.      WARRANTIES.

a.      LYNX expressly warrants to STATE FARM that:

(i)     The Services and deliverables shall fully conform to the specifications described in the applicable Work Order, Attachments, and Exhibits.

(ii)    LYNX shall correct any errors or problems in the Services and deliverables, including any issues found during an audit, at no expense to STATE FARM, provided that STATE FARM shall deliver to LYNX documentation of any such errors or problems.  If LYNX fails to promptly correct defects in or replace nonconforming Services and deliverables, after reasonable written notice to LYNX, STATE FARM may terminate or replace such Services.

(iii)   There are no actual or threatened legal proceedings that could reasonably be expected to have an adverse effect on LYNX's ability to perform its obligations under this Agreement. LYNX has a continuing obligation while this Agreement is in effect to inform STATE FARM of any such proceedings.

(iv)    LYNX will not deliver Services and deliverables that infringe the patent, copyright, trademark, or other proprietary rights of a third party.

(v)     LYNX is the owner of the Services or has obtained the right from all necessary third parties, to grant licenses for the Services and deliverables.

(vi)    LYNX possesses good title to the Services and deliverables, free and clear of all liens and encumbrances.

b.      Inspection, test, acceptance or use of the Services and deliverables furnished hereunder shall not affect LYNX's obligation under this warranty, and such warranties shall survive inspection, test, acceptance and use. This warranty shall run to STATE FARM, its successors, assigns and the users of the Services and deliverables.

c.      DISCLAIMER. EXCEPT AS SET FORTH IN THIS SECTION 9, NEITHER PARTY MAKE, AND EACH PARTY HEREBY DISCLAIMS, ANY OTHER REPRESENTATIONS OR WARRANTIES OF ANY KIND, WHETHER EXPRESS, IMPLIED OR STATUTORY, WITH RESPECT TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING ANY IMPLIED WARRANTEIS OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

10.     APPLICABILITY TO SUBCONTRACTORS.

a.      LYNX shall ensure that its subcontractors and agents performing hereunder, will also adhere to the applicable provisions of this Agreement.

b.      LYNX agrees that failure to ensure compliance of its subcontractors and agents, with this same

(CL Form 9400, rev. 02/06)                    -6-

#2000010318

provision shall be considered a material breach of this Agreement, for which STATE FARM may immediately and without penalty terminate this Agreement and/or the applicable Work Order.

c.      LYNX shall implement and maintain a program to monitor its subcontracts and other vendors ("Vendor Management Program"). LYNX shall review its Vendor Management Program with STATE FARM upon request.

11.     LOCATION OF/ACCESS TO SERVICES.

a.      LYNX agrees to provide the Services only from a location listed on the attached Exhibit K (Location of/Access to Services) or as specified in the applicable Work Order.

b.      Before LYNX may change the location of or access point to the Services to a different location or access point on Exhibit K, the LYNX shall request a change order to the then current Work Order, which STATE FARM in its sole discretion may determine whether to execute. Approval of such a change shall not be unreasonably withheld.

c.      Before LYNX may use a location or access point not listed on Exhibit K, LYNX shall request an amendment to Exhibit K. STATE FARM in its sole discretion may determine whether to execute such amendment, and if applicable, the corresponding change order. Approval of such a change shall not be unreasonably withheld.

12.     USE OF STATE FARM NAME.  LYNX expressly agrees that it shall not disclose or otherwise identify STATE FARM in any of its oral or written forms of advertising, publications, or other media that are displayed or disseminated to its customers or other parties, provided, however, that LYNX may identify STATE FARM in ways that are necessary for its performance of Services under this Agreement including but not limited to for day to day administrative operations in the LYNX call centers, dispatching Glass Claims, discussions with Glass Companies, and in the use of METRYX to support the STATE FARM O&A Program.

13.     OWNERSHIP.

a.      All LYNX materials that predate the Agreement shall remain LYNX's property.  No ownership rights in LYNX materials and transferred are assigned to STATE FARM.  During the Term of this Agreement, LYNX grants STATE FARM a limited non-exclusive, royalty-free, license to use LYNX's preexisting materials for STATE FARM's internal use only in the performance of this Agreement.

b.      No ownership rights in STATE FARM materials that predate the Agreement are transferred to LYNX. LYNX is granted a limited license to use materials provided by STATE FARM solely in the performance of this Agreement and not for LYNX's or any third party's benefit.

c.      If STATE FARM employees or third party vendors create any materials without the assistance of LYNX and without using or referencing any LYNX information or LYNX material, such materials are the sole property of STATE FARM, and LYNX has no ownership rights in them.

d.      As between STATE FARM and LYNX, STATE FARM retains all ownerships rights in any and all STATE FARM information, including but not limited to Personal Data, that STATE FARM provides or

(CL Form 9400, rev. 02/06)              -7-

#2000010319

transmits to LYNX or that LYNX acquires, collects or generates on behalf of STATE FARM.

14.    **INFRINGEMENT INDEMNIFICATION.** LYNX at its own expense shall defend and hold STATE FARM fully harmless against any action asserted against STATE FARM (and specifically including costs and reasonable attorneys' fees associated with any such action) to the extent that it is based on a claim that use of any product (the "Product"), Services or other deliverables of the Services being purchased by or provided to STATE FARM under this Agreement infringes any patent, copyright, license or other proprietary right of any third party, STATE FARM shall promptly notify LYNX in writing of any such claim. If as a result of any claim of infringement against any patent, copyright, license or other proprietary right of any third party, STATE FARM is enjoined from use the Product, Services, or other deliverables of the Services, of if LYNX believes that the Product, Services, or such deliverables are likely to become the subject of a claim of infringement, LYNX at its option and expense will procure the right for STATE FARM to continue to use the Product, Services, and such deliverables, or replace or modify the Product, Services, and such deliverables so as to make them non-infringing.

15.    **MUTUAL HOLD HARMLESS.**    Anything in the Agreement to the contrary notwithstanding, each party (the "Indemnifying Party") shall indemnify and hold the other party (the "Indemnified Party") fully harmless against any loss, damages, claims, penalties, or expenses of any kind whatsoever (including costs and reasonable attorneys' fees), sustained or incurred by a third party as a result of the negligent or intentional acts or omissions of the Indemnifying Party, and for which recovery is sought against the Indemnified Party by that third party. The Indemnifying Party also shall indemnify the Indemnified Party for any costs and reasonable attorneys' fees sustained or incurred in the Indemnified Party's defense of any such third party claim.

16.    **O&A PROGRAM INDEMNIFICATION.**  STATE FARM agrees to indemnify, defend and hold LYNX ("Indemnitee") fully harmless against any loss, damages, claims or expenses of any kind whatsoever, including costs and reasonable attorneys' fees, asserted against, sustained or incurred by Indemnitee (except to the extent arising out of or related to Indemnitee's acts or omissions) as a result of claims or litigation by third parties (I)  arising out of or related to the administration, Business Rules, guidelines, existence and operation of, the O&A Program or minimum O&A pricing; or (II) alleging that the Business Rules or any other aspect of the O&A Program designed or mandated by STATE FARM, or Indemnitee's compliance therewith, violates any applicable law or has otherwise resulted in harm to such third party. STATE FARM shall conduct and control such defense with counsel of its choosing provided STATE FARM shall not settle any claims against the Indemnitee without the Indemnitee's prior written consent; provided, however, that STATE FARM may settle claims without prior written consent of the Indemnified Party only if: (i) the settlement does not require an admission of liability on, or allocate or attribute any liability to, the Indemnitee; and (ii) the settlement is solely monetary in nature and does not impose any obligations or restrictions on the Indemnitee. STATE FARM shall not publicize any settlement without the Indemnified Party's prior written consent. Indemnitee may participate in the defense with its own counsel, such additional counsel to be at the sole expense of Indemnitee. Indemnitee shall give prompt written notice to STATE FARM upon receipt of any such claim or litigation provided any failure to provide such notice shall not relieve STATE FARM of any indemnification obligations, except to the extent the failure to give such notice actually prejudices STATE FARM. Indemnitee will  cooperate in the defense of any such claim or litigation at STATE FARM's sole expense, except for the sole expense of Indemnitee for additional counsel, per the immediately preceding sentence. Nothing in this provision shall affect or alter the obligations set forth in 15. MUTUAL HOLD HARMLESS.

#2000010319

17.    DIRECT DAMAGES FOR SECURITY BREACH.

a.    In the event there is any unauthorized access, use, acquisition, or disclosure of Personal Data (as defined below) arising out of or relating to LYNX's performance under this Agreement or arising out of or relating to the access to Personal Data by LYNX's subcontractor (to the extent permitted under the Subcontracting section) (a "Security Breach"), LYNX shall be obligated to pay, as direct damages, all reasonable costs of:

    (i)    Breach notification (including, without limitation, notifications to consumers, regulators, and/or state or federal authorities, press releases and other public notifications);

    (ii)    Credit monitoring, credit reporting, and identity theft insurance, each as deemed reasonably necessary and appropriate by STATE FARM;

    (iii)    All costs, damages, and expenses incurred by or imposed upon STATE FARM in connection with any third party claims or lawsuits arising out of such Security Breach;

    (iv)    All fines and penalties imposed by a governmental or regulatory authority upon STATE FARM as a result of such Security Breach;

    (v)    Reasonable call center support for affected individuals for a period not to exceed thirty (30) days; and

    (vi)    All other direct damages, including attorneys' fees, resulting from such Security Breach; provided, that prior to being recoverable under this Section 17, such direct damages must be both reasonably demonstrated and quantified.

b.    "Personal Data" means data and/or information that is owned or controlled by STATE FARM that names or identifies or is about a natural person, such as: (i) data that is explicitly defined as a regulated category of data under any data privacy laws applicable to STATE FARM; (ii) non-public personal information (NPI) or personal information (PI), such as national identification number, passport number, social security number, social insurance number, or driver's license number; (iii) health or medical information, such as insurance information, medical prognosis, diagnosis information or genetic information; (iv) financial information, such as a policy number, credit card number and/or bank account number; (v) personally identifying technical information (whether transmitted or stored in cookies, devices or otherwise), such as IP address, MAC address, device identifier, International Mobile Equipment Identifier (IMEI), or advertising identifier; (vi) biometric information; and/or (vii) sensitive personal data, such as, race, religion, marital status, disability, gender, sexual orientation, geolocation, or mother's maiden name.

18.    MUTUAL LIMITATION OF LIABILITY.

a.    EXCEPT FOR THE PROVISIONS OF SECTION 14 (INFRINGEMENT INDEMNIFICATION), SECTION 15 (MUTUAL HOLD HARMLESS), SECTION 16 (O & A PROGRAM INDEMNIFICATION) AND SECTION 17 (DIRECT DAMAGES FOR SECURITY BREACH), ANYTHING IN THE AGREEMENT TO THE CONTRARY NOTWITHSTANDING, UNDER NO CIRCUMSTANCES WHATSOEVER SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY SPECIAL, CONSEQUENTIAL, PUNITIVE, INDIRECT, OR INCIDENTAL DAMAGES OF ANY KIND WHATSOEVER.

b.    SUBJECT TO SECTION 18(C) BELOW, EXCEPT FOR THE PROVISIONS OF SECTION 14 (INFRINGEMENT INDEMNIFICATION), SECTION 15 (MUTUAL HOLD HARMLESS), AND SECTION 16 (O & A PROGRAM INDEMNIFICATION), IN NO EVENT WHATSOEVER SHALL EITHER PARTY'S TOTAL LIABILITY TO THE OTHER FOR ANY OTHER DAMAGES WHATSOEVER EXCEED IN THE AGGREGATE

(CL Form 9400, rev. 02/06)                    -8-

#2000010319

THE SUM OF FIVE MILLION DOLLARS ($5,000,000).

c.　　NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, IN NO EVENT WHATSOEVER SHALL LYNX'S TOTAL DAMAGES OR LIABILITY TO STATE FARM ARISING OUT OF SUBSECTIONS (I),(II), (V) AND (VI) OF SECTION 17 (DIRECT DAMAGES FOR SECURITY BREACH) TO THE EXTENT SUCH DAMAGES OR LIABILITY DO NOT ARISE OUT OF OR RELATE TO A LEGALLY REQUIRED BREACH NOTIFICATION, EXCEED IN THE AGGREGATE THE SUM OF FIVE MILLION DOLLARS ($5,000,000). FOR THE AVOIDANCE OF DOUBT THE PARTIES AGREE AND UNDERSTAND THAT ANY LIABILITY OR DAMAGES ARISING OUT OF SECTION 17 DUE TO A LEGALLY REQUIRED BREACH NOTIFICATION SHALL REMAIN UNCAPPED.

19.　　COMPLIANCE.　The parties agree to implement and maintain measures to comply with any applicable state or federal law or regulation governing the provision, receipt, maintenance, storage, or destruction of Personal Data, including but not limited to any applicable provisions of the Health Insurance Portability and Accountability Act ("HIPPA"), the Fair Credit Reporting Act ("FCRA"), the Fair and Accurate Credit Transactions ("FACT") Act, Gramm Leach-Biley Act ("GLBA"), and the Interagency Guidelines Establishing Standards for Safeguarding Customer Information (12 C.F.R. Part 570 Appendix B), including the Interagency Guidance on Response Programs for Unauthorized Access to Customer Information and Customer Notice, and that STATE FARM shall have the right to evaluate and monitor such measures.

20.　　SECURITY.

a.　　LYNX shall implement and maintain a documented information security program (the "Security Program") applicable to all facilities, networks, infrastructure, and cloud resources used by LYNX to provide the Services, including any applicable subcontractor facilities, networks, infrastructure, and cloud resources. Such Security Program must contain administrative, technical, and physical safeguards to monitor LYNX's systems and protect STATE FARM Information against anticipated threats or hazards regarding: security, confidentiality, or integrity; unauthorized or accidental destruction, loss, alteration, or use; and unauthorized access or acquisition. The Security Program must be consistent with applicable industry standards for financial institutions (e.g., FFIEC IT Examination Handbook, NIST Security Framework, ISO 27002, etc.). LYNX shall provide training on the Security Program for its employees and applicable subcontractors. LYNX's employees and subcontractors will comply with the Security Program while LYNX provides Services to STATE FARM. LYNX shall review the Security Program with STATE FARM upon request.

b.　　LYNX's Security Program shall include, but not be limited to, the following industry standard security practices:

(i)　　LYNX shall ensure the security of any LYNX or subcontractor facility, network, or device storing or enabling access to STATE FARM Information to prevent unauthorized access or use.

(ii)　　LYNX shall restrict access to STATE FARM Information to employees, affiliates and subcontractors performing Services under this Agreement or who have a need to know such informationLYNX shall keep a current list of all individuals with access to STATE FARM Information on LYNX systems or devices and periodically update said list.

(CL Form 9400, rev. 02/06)　　　　　-10-

#2000010319

(iii)    LYNX shall maintain audit logs of access to STATE FARM Information from its systems and devices for a minimum of one (1) year and provide such logs to STATE FARM upon request.

(iv)    LYNX shall encrypt STATE FARM Information while in transit or stored on LYNX's network, using industry standard encryption controls (e.g., TLS, AES 256 bit, etc.).

(v)    LYNX shall logically separate STATE FARM Information from other records, including when stored on backup media.

(vi)    LYNX shall monitor its systems for attacks, intrusions, exfiltration, or unauthorized transmissions.

(vii)    LYNX shall install all security patches and operating system updates for any devices or interfaces within the Services within a commercially reasonable time following release.

(viii)    LYNX shall prohibit any connection to the STATE FARM network that allows cross-network access between the STATE FARM network and any other network (e.g., split tunneling).

(ix)    LYNX shall limit access to any STATE FARM Information by providing unique user IDs and require strong passwords for all authorized users ("Authentication Credentials"). LYNX may not allow more than one user to have the same Authentication Credentials to access any STATE FARM Information. Any passwords stored by the LYNX must be encrypted and stored within an industry standard password management tool.

(x)    LYNX shall prohibit any use of Personal Data in a test or development environment, or for other testing purposes, without prior written approval from STATE FARM.

c.    LYNX will provide prior written notice to STATE FARM of any adverse material changes to the Security Program. LYNX shall retain a log of any changes to its Security policies and Security training Programs, and will review such log with STATE FARM upon reasonable request.

21.    SECURITY INCIDENT NOTIFICATION AND RESPONSE.

a.    Security Incident Response Plan. LYNX shall use its Security Program to monitor for any actual or suspected unauthorized access, use, disclosure, modification, or destruction of: (i) Information; or (ii) any system that hosts, stores, or supports Information (each a "Security Incident"). LYNX's Security Program shall include a plan consistent with industry standards for detecting, identifying, and responding to Security Incidents ("Security Incident Response Plan"). LYNX shall review the Security Incident Response Plan with STATE FARM upon request.

b.    Security Incidents Involving State Farm Information. In the event there is a Security Incident that LYNX reasonably believes or suspects may affect the confidentiality, integrity, or availability of STATE FARM Information (including but not limited to any systems that host, store, or support STATE FARM Information), LYNX agrees to the following:

(i)    LYNX shall provide immediate notice to STATE FARM of such Security Incident by calling 1-

(CL Form 9400, rev. 02/06)                -11-

#2000010319

877-766-6371 and referencing Knowledge Item # 99314, and shall follow up via email within twenty-four (24) hours of LYNX's discovery of such Security Incident. LYNX's notice to STATE FARM shall include the following information, to the extent known at that time:

    (a)    Date and time the Security Incident began and was discovered;

    (b)    Description of the cause and nature of the Security Incident; and

    (c)    Whether LYNX has notified a law enforcement or regulatory authority of the Security Incident.

(ii)    Except as may be required by law, LYNX is prohibited from communicating with any individual or third party (other than law enforcement) regarding any unauthorized access, use, or disclosure of STATE FARM Personal Data without prior written permission of STATE FARM. STATE FARM shall have sole discretion whether to provide notice to any affected individuals or third parties following a Security Incident.

(iii)    LYNX shall promptly investigate the Security Incident and take all necessary steps to appropriately mitigate the threats or exposures that led to such Security Incident. LYNX shall provide periodic updates and any additional information regarding such Security Incident as reasonably requested by STATE FARM. LYNX shall not destroy any information (including audit logs) related to such Security Incident until both parties reasonably agree the information is no longer needed.

(iv)    LYNX agrees to provide assistance, cooperation, and access to facilities and systems requested by STATE FARM and STATE FARM's designated representatives, regulators, and/or law enforcement authorities in the investigation, remediation, or mitigation of the Security Incident.

(v)    At reasonable times and upon at least ten (10) business days prior written notice, STATE FARM shall have the right to conduct an audit of LYNX records, systems and security to the extent that they relate directly to LYNX's obligations under this Section 21 or other information security obligations under this Agreement, provided that STATE FARM shall use reasonable efforts to not materially interfere with LYNX's normal business operations notwithstanding any limits as to timing or notice set forth in Section 22 (Audit) of this Agreement.

(vi)    STATE FARM, in addition to any other available remedies, may seek an immediate injunction and/or other equitable relief. STATE FARM will not be required to post a bond or prove any damages if it seeks such injunction or relief.

(vii)    STATE FARM may immediately and without penalty: (i) terminate this Agreement; and/or (ii) terminate any individual Work Order.

c.    <u>Security Incidents Not Involving State Farm Information</u>. In the event there is a Security Incident that does not affect the confidentiality, integrity, or availability of STATE FARM Information, but has a material impact on LYNX or its other customers and that triggers a notification to affected parties as required by applicable law, LYNX shall provide an executive summary of such Security Incident to STATE FARM within 14 days following LYNX's discovery of the Security Incident.

#2000010319

22.    AUDIT. STATE FARM, or its designated representative, at reasonable times and provided LYNX's normal business operations are not disrupted, shall have the right (including but not limited to on-site visits to LYNX's premises and any LYNX's subcontractors' premises) to audit the records, systems, and security of LYNX and any subcontractors of LYNX related to the performance of this Agreement, on ten (10) business days' prior written notice. LYNX agrees to cooperate with STATE FARM to resolve any auditing concerns, including but not limited to auditing concerns related to its subcontractors.

23.    AUDIT REPORTS.

a.    SSAE 16 (SOC 1 Type II) (financial reporting). On the effective date of this Agreement and annually thereafter as may be requested by STATE FARM, LYNX shall provide STATE FARM a copy of its most recent SSAE 16, SOC 1, Type II audit (or its equivalent audit report relating to financial reporting) applicable to all of its processes, systems and networks involved in LYNX's performance of this Agreement.

b.    AT 101(SOC 2 Type II) (security reporting). As may be requested by STATE FARM, LYNX agrees to undergo a SOC 2, Type II audit (or its equivalent audit report relating to security) applicable to all of its processes, systems, and networks involved in LYNX's performance of this Agreement.

24   .  BUSINESS CONTINUITY AND DISASTER RECOVERY.

a.    LYNX shall create, implement, and maintain a Business Continuity/Disaster Recovery Plan (the "Plan") that (i) covers all Services provided to STATE FARM under the Agreement in any LYNX managed location, (ii) assures that such Services will continue through a disaster or some operational failure or interruption, and (iii) defines the trigger events that prompt Plan activation.

b.    LYNX shall:

   (i)    Deliver a current copy of such Plan to STATE FARM upon request, a current copy of the Plan is attached hereto as Attachment D.
   (ii)   Update and test the operability of such Plan at least once annually.
   (iii)  Certify to STATE FARM at least once annually that the Plan is fully operational; and
   (iv)   Implement the Plan upon the occurrence of a disaster or significant outage.

c.    LYNX agrees to work with STATE FARM to resolve to STATE FARM's satisfaction any issues raised during such testing of the Plan. Any specific requirements of STATE FARM for such testing will be included in the applicable **Attachment D.** LYNX shall notify STATE FARM ninety (90) days in advance of any scheduled test of the Plan applying to the Services, and shall provide STATE FARM the opportunity to participate in those portions of such test covering the Services. If LYNX fails to demonstrate in any such test that its Plan is fully operational to assure the continuity of its Services to STATE FARM, LYNX will deliver to STATE FARM within sixty (60) days of such failure, a plan identifying the corrective action(s) and completion date(s) to prevent reoccurrence of such failure(s).

d.    In the event LYNX's service or support facility becomes inoperable, LYNX shall have a disaster recovery site opened and operational within three (3) business days of the loss of such facility's capability.

#2000010319

25.    NOTICES.

a.    Any notice provided for herein must be in writing, and it will be deemed to have been given, delivered, or served when delivered to the party who is to receive it.

Any notice sent to STATE FARM must include LYNX legal name, title of contract, and contract number, if applicable.

b.    Unless the LYNX notifies STATE FARM in writing of different contact information, STATE FARM will provide any written notice to the LYNX to:

>    LYNX Services, L.L.C.
>    ATTN: President
>    6351 Bayshore Road, Suite 18
>    Fort Myers, Florida 33917
>    (239) 479-6010
>
>    With a copy to:
>    Solera Holdings, Inc.
>    Attn: General Counsel
>    1301 Solana Blvd.
>    Building #2, Suite 2100
>    Westlake, TX 76262

c.    Unless STATE FARM notifies LYNX in writing of different contact information, LYNX will provide any written notice to STATE FARM to:

>    State Farm Mutual Automobile Insurance Company
>    ATTN: Claim Consultant
>    One State Farm Plaza, (A, 4)
>    Bloomington, IL 61710
>    Home.purch-vendor-notices.013h00@statefarm.com

d.    In addition to providing the above written notice to STATE FARM, in the case of a breach or inadvertent disclosure of Personal Data, LYNX shall immediately report such breach to STATE FARM at:

>    1-877-766-6371 and referencing "Knowledge Item # 99314"

e.    For any required notice that could harm the intended recipient's legal rights if not properly received (for example, notices of a lawsuit against the recipient, termination or assignment of the contract, bankruptcy, name change, etc.) the sending party must send a hard copy notice and may also, in its sole discretion, send an electronic notice to fulfill the requirements of this section. Unless the parties specify otherwise in this Agreement, for any other required but more routine business notice, the sending party may solely use an electronic notice by itself to fulfill the requirements of this section.

#2000010319

26.    INSURANCE.

a.    LYNX shall pay the premium for, and keep in force until the termination of this Agreement, the following insurance:

    (i)    Workers' Compensation at statutory limits for occupational disease and injury coverage, including Employer's Liability coverage at a limit of not less than U.S. $500,000;

    (ii)    Commercial General Liability, including Premises and Operations coverage and Products and Completed Operations coverage at not less than U.S. $1,000,000 per occurrence;

    (iii)    Network Security & Privacy Liability/Technology Professional Liability insurance providing "technology errors and omissions liability" or equivalent coverage for the covered technology services described specifically herein, with limits of not less than U.S. $25,000,000 per claim and aggregate.  Such insurance shall cover errors, omissions, or negligent acts in the delivery of products and services under this Agreement.  Insurance shall include coverage for claims and losses with respect to network risks (such as data breaches, unauthorized access/use, ID theft, invasion of privacy, damage/loss/theft of data, degradation, downtime, etc.) and copyright, trademark, service mark and trade dress; and

    (iv)    Excess liability insurance, Umbrella Form, shall carry coverage in excess of the limits provided for in the above policies (except Workers' Compensation, Network and Professional Liability), with a limit of not less than U.S. $25,000,000.

b.    Upon STATE FARM's request, LYNX shall provide STATE FARM a Certificate(s) of Insurance verifying that it has these insurance coverages. LYNX must provide at least a thirty (30) day notice to STATE FARM of an adverse material change to or cancellation of a policy. State Farm Mutual Automobile Insurance Company will be listed on the Certificate as an additional insured under SERVICE PROVIDER's Commercial General Liability policy.

27.    INDEPENDENT CONTRACTOR.

a.    The parties expressly agree that LYNX shall be an independent contractor for all purposes in the performance of this Agreement, and that none of its employees, subcontractors, or agents shall be considered an employee of STATE FARM for any purpose. LYNX shall be responsible for compliance with all tax, workers compensation and other applicable laws or regulations relating to its employees and business. LYNX accepts exclusive liability for all contributions and payroll taxes payable under federal and state laws and regulations governing social security or old age benefits, unemployment insurance, and workers compensation for its employees performing services under this Agreement.

b.    LYNX will not adjust any Glass Claims on behalf of STATE FARM. LYNX will only provide administrative services and facilitate the processing and billing of Glass Claims for STATE FARM policyholders. In addition, nothing shall be construed by virtue of this Agreement to imply or infer that LYNX, or LYNX's subcontractors are a service provider to STATE FARM's policyholders under State Farm's insurance policies. LYNX has the responsibility to require and to direct the compliance of its subcontractors with this same provision.

28.    TAXES.

(CL Form 9400, rev. 02/06)    -15-

#2000010319

a.      STATE FARM shall pay any legally imposed sales, use or similar excise taxes that are the legal liability of, or are required to be collected from, STATE FARM. Under no circumstances shall STATE FARM be liable for any interest, penalties, fines, or other such charges incurred due to the failure of LYNX to pay or collect when due any taxes owed with respect to the Agreement, or due to the failure of LYNX to notify STATE FARM of any taxes owed with respect to the Agreement. STATE FARM shall not be required to pay or reimburse LYNX for taxes based upon the net income or capital of LYNX, nor for taxes imposed upon LYNX solely by reason of LYNX's doing business in or being incorporated in the jurisdiction imposing such taxes.

b.      In the event STATE FARM notifies LYNX of its intent to contest taxability of LYNX's products and/or services with LYNX, LYNX shall reasonably cooperate with STATE FARM, in good faith, to substantiate and/or adjust taxability to the agreement of both LYNX and STATE FARM.  In no event shall LYNX be obligated to perform any action, including and without limitation to, filing refund claims in LYNX's own name, if such action in any way conflicts or interferes with the rules and regulations of the applicable states laws and statutes with which LYNX must comply or if such action would potentially create or impose any tax or other liability on LYNX.

29.     TERMINATION.

a.      Subject to Section 52 (Force Majeure) and the provisions of this section, if either party neglects or fails to perform any of its obligations under this Agreement and such failure continues beyond the "Cure Period" described below in this subsection, the other party shall have the right to terminate this Agreement.

1)      Contracted Service Levels - With respect to failures to meet Contracted Service Levels as those levels are established in the attached Service Level Agreement, which is incorporated herein as Attachment I, or any other performance obligations of LYNX under this Agreement, the Cure Period shall be thirty (30) days and shall begin on the date written notice is received by LYNX in accordance with Section II of Attachment I, Service Level Agreement.

2)      Total Interruption of Services - With respect to a total interruption of Services to be provided by LYNX, other than as a result of a Force Majeure, the Cure Period shall be thirty (30) days and shall begin on the first day of such total Service interruption.

3)      All Other Failures to Perform - With respect to all other failures to perform obligations under this Agreement, other than Attachment B, Section II, subsection b, the party with an obligation to cure shall (i) initiate the cure within thirty (30) days of receiving notice of such failure and (ii) complete the cure within such thirty (30) days; or demonstrate substantial progress toward the cure within such thirty (30) days and complete the cure to the other party's satisfaction within no more than a sixty (60) day Cure Period.

d. If either LYNX or STATE FARM reasonably determines in good faith that its continued participation in this Agreement will constitute a violation of the laws or regulations of a jurisdiction, then such party may terminate this Agreement with respect to such jurisdiction only, either immediately upon written notice or, if due to a change in law or regulation in that jurisdiction, no earlier than the effective date of such change.

e. If LYNX starts-up, acquires, or obtains an equity interest in any entity that engages in, or controls an entity that engages in, retail automotive glass repair or replacement in the United States, and such entity's business operation is or can be controlled by LYNX,  LYNX shall send a written notice to STATE FARM immediately

#2000010319

upon the occurrence.   Upon receipt of such notice, STATE FARM shall have the right to terminate this Agreement within ninety (90) days. If STATE FARM does not terminate this Agreement within such ninety (90) days, this Agreement shall continue in its present form with LYNX obligated to administer the program according to this Agreement and its Attachments. If STATE FARM exercises its right to terminate under this sub-section, STATE FARM will notify LYNX of the end date of the Agreement ("Termination Effective Date") and LYNX will continue to be obligated to operate the program as prescribed in the Agreement and all Attachments until the Termination Effective Date.

f. At the end of this Agreement, including any termination of this Agreement, each party agrees to cooperate with the other in terminating the relationship and the electronic connections established between the parties in a way that causes the least disruption possible to STATE FARM's policyholders with Glass Claims.

g. If LYNX assigns the Agreement to another entity without receiving STATE FARM's prior written approval, or if there is an affiliation, merger, or acquisition involving LYNX, STATE FARM may terminate the Agreement immediately, and shall provide written notice thereof.

30.    MEDIATION.

Any dispute arising out of or relating to this Agreement, including its interpretation, validity or enforceability, shall be resolved in accordance with the procedures specified in this Section 30, which shall be the sole and exclusive procedures for the resolution of any such disputes. The parties shall attempt in good faith to resolve any dispute arising out of or relating to this Agreement promptly by negotiation between leadership who have authority to settle the controversy and who are at a higher level of management than the persons with direct responsibility for administration of this Agreement. Within 30 days after receiving written notice of a dispute, the receiving party shall submit to the other a written response. The dispute notice and response shall include (a) a statement of that party's position and a summary of arguments supporting that position, and (b) the name and title of the leader who will represent that party and of any other person who will accompany the executive. Within 90 days after delivery of the initial notice, or such other time frame as may be agreed by the parties, the executives of both parties shall meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the dispute. If the dispute has not been resolved by negotiation as provided herein within 120 days after delivery of the initial notice of negotiation, or if the parties failed to meet as required hereunder, either party may commence non-binding mediation process under the CPR Mediation Procedure by providing to the other party written notice. The parties will select one mediator from the CPR Panels of Distinguished Neutrals. The initial mediation session shall be held within thirty (30) days after the initial notice of intent to mediate. The parties agree to share equally the costs and expenses of the mediation (which shall not include the expenses incurred by each party for its own legal representation in connection with the mediation). If the dispute has not been resolved within sixty (60) days following the initial mediation proceeding, either party may initiate litigation; provided, however, that either party may seek injunctive relief at any time. The parties further acknowledge and agree that negotiations and mediation proceedings under this Section 30 are settlement negotiations, and that, to the extent allowed by applicable law, all offers, promises, conduct and statements, whether oral or written, made in the course of the mediation by any of the parties or their agents shall be confidential and inadmissible in any arbitration or other legal proceeding involving the parties; provided, however, that evidence which is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the mediation. The provisions of this Section may be enforced by any Court of competent jurisdiction.

· #2000010319

31.    ASSIGNMENT. Anything in the Agreement to the contrary notwithstanding, LYNX may not assign the Agreement to any other entity, including an entity that affiliates or merges with or acquires LYNX, except when such assignment is approved in advance by STATE FARM in writing, which approval STATE FARM may in its sole discretion grant or deny (but such approval shall not be unreasonably withheld). If LYNX assigns the Agreement to another entity without receiving STATE FARM's prior written approval, of if there is an affiliation, merger, or acquisition involving LYNX, STATE FARM may terminate the Agreement immediately, and shall provide written notice thereof.

32.    LOAN OF EQUIPMENT. In the event STATE FARM, in its sole discretion, decides to loan equipment to LYNX to facilitate LYNX's performance of the Services under this Agreement, then LYNX shall be responsible for any loss or damage to such equipment and shall return such equipment upon written notice from STATE FARM. LYNX shall use such equipment solely for the purpose of performing the Services under this Agreement.

33.    PERSONAL DEVICES

a.    . LYNX acknowledges and agrees that it will not electronically transmit/send any STATE FARM Personal Data or Information, including any claim estimate data related documents to any of its employee personally owned, leased or rented computer equipment, and/or electronic equipment of any type, including any type of smart phone technology equipment.

b.    LYNX acknowledges and agrees that it will not electronically transmit/send any STATE FARM Personal Data or Information, including any claim estimate data related documents to any subcontractor's personally owned, leased or rented computer equipment, and/or electronic equipment of any type, including any type of smart phone technology equipment.

34.    BILLING RECORD REVIEW.

a.    LYNX acknowledges and agrees that STATE FARM, at STATE FARM's expense, shall have the right (including but not limited to on-site visits to LYNX's premises to audit up to three years (3) years of LYNX's applicable documents related to this Agreement including all records and payments received from STATE FARM under this Agreement, upon at least fifteen (15) business days prior written notice during normal business hours. All audits shall be conducted by an independent, third party auditor. LYNX agrees that this STATE FARM right shall continue for a period of up to three (3) years after the final payment is received from STATE FARM for Services performed under this Agreement. The parties agree that at the time of any such request, STATE FARM's access to this information shall be limited to the format the information is being stored in by LYNX. LYNX further agrees that should any Billing Record Review reflect overpayments or incorrect payments for any reason as received from STATE FARM, then LYNX will immediately refund STATE FARM the overpayment or incorrect payment or bill STATE FARM for any underpayment within thirty (30) days following the date of the completion of such Billing Record Review.  The third party auditor shall sign a LYNX standard confidentiality agreement prior to commencing the audit, agreeing to keep confidential any information obtained by such examination, provided however, that the auditor shall have the ability to disclose to State Farm the details of any non-compliance with this Agreement and the applicable supporting documentation relating to such non-compliance.

#2000010319

b.     LYNX has the responsibility to assure compliance of its subcontractors with this same provision that perform the Services under this Agreement, including on-site visits to audit up to three (3) years of the subcontractor's applicable documents surrounding the performance of the Services of this Agreement.

35.    ANTI-CORRUPTION/FCPA.

a.     Compliance Policy.  LYNX acknowledges that it is the policy of STATE FARM to comply with all applicable laws of the United States ("U.S.") and each other jurisdiction in which STATE FARM conducts business.  LYNX represents and warrants that LYNX understands and will comply with the U.S. Foreign Corrupt Practices Act (FCPA) (15 USC Section 78dd-1, et seq.) and with any other applicable anti-bribery laws.
Compensation.  Any compensation paid by STATE FARM to LYNX is for LYNX's sole benefit; and LYNX shall not (i) illegally transfer or assign to any third party any such compensation,  or (ii) make any payments prohibited under the FCPA to a third party on behalf of STATE FARM.

b.     Controls and Procedures.  LYNX represents, warrants and covenants that LYNX has, and shall maintain, effective disclosure controls and procedures and an internal accounting controls system that are sufficient to prevent, detect, and deter violations of law (including anti-corruption laws).

36.    OFFICE OF FOREIGN ASSETS CONTROL ("OFAC").  LYNX represents, warrants and covenants that: LYNX is not (i) the subject or target of any sanctions administered or enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), including but not limited to Persons identified on OFAC's Specially Designated Nationals and Blocked Persons List ("SDN List") (collectively "Sanctions"); or (ii) located, organized, or resident in a country, region or territory that is, or whose government is, the subject or target of Sanctions.

a.     LYNX shall not use individuals or entities that are the subject or target of Sanctions, including but not limited to OFAC's SDN List.

b.     LYNX shall comply in all respects with any applicable Sanctions, and shall take no action that would cause STATE FARM to be in breach of any applicable Sanctions.

37.    ELECTRONIC DATA RECOVERY SERVICES.  LYNX agrees to provide STATE FARM with electronic data recovery services (including data recovery time and point objectives as set forth herein) related to the services provided by LYNX under the Agreement.  Such recovery services shall include, but not be limited to, (a) developing and implementing a standard for data loss not exceeding 24 hours of processing and (b) developing and implementing a recovery services solution designed to recover data regarding STATE FARM's customers (whether stored in an electronic or paper form) within 24 hours of the event, return to service any software, hardware or networking systems provided by LYNX, and restore to functionality any other systems provided by LYNX to STATE FARM.

LYNX will test the recovery services solution annually and following any material updates or changes to such solution that LYNX has designed. LYNX will provide STATE FARM with a written description of its recovery services solution and with reports of any tests of that solution.

38.    PCI DSS LANGUAGE

(CL Form 9400, rev. 02/06)                -19-

#2000010319

a.      For any Services under this Agreement that require the transfer to LYNX of credit card, debit card, and payment card information in order for LYNX to perform the services ("Card Services"), LYNX will conduct such Card Services, and treat any information obtained in the course of those Card Services, in a manner consistent with all applicable laws, regulations, and the Payment Card Industry Data Security Standard ("PCI-DSS"), as may be amended from time to time. The parties acknowledge that no Services currently constitute Card Services. To the extent any Card Services are required to be provided, the parties agree they will first negotiate in good faith and reasonably agree on an incremental fee under this Agreement to compensate LYNX for the increased operating costs associated with the performance of such Card Services for STATE FARM.

b.      LYNX, to the extent applicable, commits that it will review all corrective action recommendations and will perform modifications or recommend changes to operating procedures that the parties mutually determine are necessary or desirable. For any such changes or modifications that are solely the result of a STATE FARM request and that result in a significant increase in scope or in LYNX's costs in providing the Card Services, LYNX will be entitled (through a Change Order) to propose an increase of the charges for the Card Services by an amount that reflects a pro rata allocation of LYNX's increased cost among LYNX customers of services similar to the Card Services. The LYNX will make all necessary changes to its Card Services in order to comply with all applicable laws, regulations, and PCI-DSS, whether in place before or after the execution of the Agreement, and will do so as quickly as reasonably possible and at no additional cost to STATE FARM.

c.      If LYNX is performing Card Services, LYNX will perform a PCI-DSS assessment conducted by a third party Qualified Security Assessor (QSA) and provide an Attestation of Compliance (AOC) on the effective date of this Agreement and annually thereafter.

In the event an audit of STATE FARM's PCI-DSS compliance includes the Card Services, LYNX will fully cooperate and provide reasonable assistance as requested by STATE FARM at STATE FARM's expense.

39.    PARENT GUARANTY. LYNX shall obtain the guaranty of Solera Holdings, Inc. in favor of STATE FARM (the "Guaranty") as a condition precedent to the effectiveness of this Agreement. The Guaranty shall be dated and effective as of the date of the Agreement.

40.    LETTER OF CREDIT.

a.      LYNX will maintain an irrevocable letter of credit from a bank with a U.S. presence under U.S. Federal Reserve guidelines in a form reasonably acceptable to STATE FARM in the aggregate amount of $15 million (the "LOC"), to secure LYNX's obligations relating to the payment with funds received from STATE FARM for the invoices from Glass Companies and Non-O&A Glass Companies performing work on Glass Claims for STATE FARM policyholders, as described in Attachment B, Section II, of this Agreement. LYNX shall bear the expense of preparing and maintaining the LOC, including, but not limited to any and all fees, charges, and expenses charged by the issuing bank for the LOC. The LOC shall (i) name "State Farm Mutual Automobile Insurance Company" as beneficiary (ii) not expire until five (5) business days following the later of (1) the expiration of the term of this Agreement, (2) the date on which all Glass Companies and Non-O&A Glass Companies have been paid, or otherwise satisfied, in STATE FARM's sole discretion, for work performed on Glass Claims for STATE FARM policyholders with funds received from STATE FARM on or before the date this Agreement is terminated, provided that STATE FARM shall respond to any written

(CL Form 9400, rev. 02/06)                -20-

#2000010319

request from LYNX, following termination of the Agreement, for confirmation of the same within sixty (60) days of receipt of such a request and, (3) failure of STATE FARM to respond to a request from LYNX as outlined in subpart (2), above; provided, that the initial term of the LOC shall be five years (the "Initial Term") and, at least fifteen (15) business days prior to the expiration of the Initial Term, LYNX shall replace the LOC with a substitute letter of credit on the same terms and conditions as the LOC; (iii) not place any conditions, qualifications or certifications on the beneficiary draw on the LOC other than (1) the beneficiary prepare a draft or drafts in order to draw on the funds; and (2) present (upon the terms for presentation set forth in the LOC) a written statement to the issuer signed by an authorized representative of the beneficiary stating that beneficiary is entitled to draw on the LOC.

b.      If, at any time during The term of the Agreement, State Farm exercises its right to draw under the LOC, LYNX shall not be required to replenish the LOC back to $15 million until such time as the maximum amount available under the LOC is less than $10 million. In such instance within five (5) business days of such reduction, LYNX shall (at LYNX's option) either (i) deliver to STATE FARM an amendment to the LOC evidencing that the maximum stated amount available to draw under the LOC has been increased back to $15 million; or (ii) deliver to STATE FARM an additional letter of credit (the "Top-up LOC"), which shall be in the same form as the LOC and shall have a maximum stated amount equal to the amount the LOC has been reduced by all prior draws such that when the maximum stated amount of the Top-Up LOC and the then-remaining undrawn amount of the LOC are added together, the maximum stated amount of the Top-Up LOC and the LOC shall, in the aggregate, equal $15 million.

c.      The failure to maintain the LOC or timely provide a substitute letter of credit upon expiration of its Initial Term, all as required under this Section 40 shall be a breach of this Agreement, and STATE FARM shall have the right to draw under the LOC, in full, and without prior notice to LYNX, provided that any such funds withdrawn in excess of the funds received from STATE FARM for the invoices from Glass Companies and Non-O&A Glass Companies performing work on Glass Claims for STATE FARM policyholders that are not paid by LYNX within the normal payment process and agreed upon payment time frame, shall be returned to Goldman Sachs Bank, USA, or such other banking institution as the funds may have been withdrawn from, upon STATE FARM's receipt of a substitute letter of credit in substantially the same form as the original LOC. Any draw on the LOC by STATE FARM due to a default or breach by LYNX of this Agreement shall be in addition to, and not in lieu of, any and all other rights or remedies STATE FARM may have under this Agreement or at law or in equity.

d.      STATE FARM expressly agrees that it shall be liable to LYNX for any Specified Losses (as defined below) incurred by LYNX as a result of any improper, unsubstantiated or unauthorized ("unauthorized") drawing by STATE FARM under any LOC required by this Section 40. "Specified Losses" shall mean (i) the aggregate amount of any unauthorized drawing by STATE FARM under any LOC required by this Section 40, (ii) any interest that accrues or is payable by LYNX to the issuer due to any unauthorized drawing by STATE FARM under any LOC required by this Section 40 and (iii) any legal fees, costs and expenses incurred by LYNX to collect from State Farm those amounts under (i) and (ii) above. LYNX agrees to furnish to STATE FARM a copy of the invoice statement from the issuer that would reflect any interest that would have accrued and that was payable by LYNX as a result of an unauthorized drawing by STATE FARM under any LOC as required by this Section 40.

41.     CLICK-THROUGH AGREEMENT/ON-LINE TERMS. No terms and conditions related to the subject matter of this Agreement and presented at any time in a "click-through" or "click-wrap" agreement or web site shall apply to such subject matter. LYNX agrees to assure by contract with any third party owner of software

#2000010319

and/or provider of Services that the preceding term applies to such software and/or Services.

42.    EXPORT.    The parties agree that LYNX shall be solely responsible for compliance regarding any GTS Software and/or related software services under the Sub-license ("GTS Software Services") deemed to be "retail" for purposes of the United States Export Administration Regulations (EAR). If the GTS Software is not deemed to be "retail" for purposes of EAR, the LYNX will cooperate with STATE FARM if STATE FARM attempts to obtain permission to export the GTS Software and/or GTS Software Services.    STATE FARM agrees that it will not try to export any Software provided under this Agreement without the prior written consent of LYNX.

43.    SOFTWARE USE AND ACCESS.

Anything in the Agreement to the contrary notwithstanding and subject to (i) the confidentiality requirements of Section(s) 5 of the Agreement, and (ii) STATE FARM's obligations to pay license fees as determined under the Agreement, LYNX agrees that:

(a)    STATE FARM, its third party contractors, and independent contractor and financial services agents are licensed to use or access the GTS Software on any equipment, without regard to whether such equipment is owned, leased or controlled by STATE FARM or located on STATE FARM premises, provided that such use or access is for the sole benefit of STATE FARM and provided no third party who is known or identified to be a competitor of LYNX, GTS or any LYNX affiliate or subsidiary is given access to the GTS Software for any reason or purpose.

(b)    The GTS Software may be used in or accessed from any location, including offshore locations, provided that STATE FARM complies with the export requirements of Section 42 of the Agreement.

(c)    STATE FARM may provide the GTS Software to third party contractors, provided that the third party contractor is not known or identified to be a competitor of LYNX, GTS or their affiliates and has agreed in writing that: (i) the GTS Software will be used for the sole benefit of STATE FARM; and (ii) the GTS Software will be removed from the third party contractor's equipment when the work being contracted for is completed or the third party's contract with STATE FARM is terminated, whichever comes first; (iii) is used only for the services contemplated herein.

(d)    STATE FARM and its third party contractors are permitted to use or access the GTS Software on or in combination with any authorized operating system or authorized operation platform.    LYNX's warranties and infringement indemnification will not apply if the GTS Software is used on a platform other than the GTS Software's natural operating platform(s) or if it us used in combination with other products or services if but for such combination the GTS Software would not have infringed any third party rights."

44.    NO WAIVER OF BREACH. If either party on any occasion breaches any term of this Agreement, and the other party does not enforce that term, the failure to enforce on that occasion shall not prevent enforcement on any other occasion.

45.    TIME IS OF THE ESSENCE.    The parties agree that time is of the essence, and that the transaction set forth in the Work Order shall be completed by the date specified.

#2000010319

46.   NOTIFICATION OF MATERIAL CHANGE IN BUSINESS. LYNX agrees that if it experiences any material changes in its business, including without limitation, a reorganization, acquisition, refinancing, restructuring, leveraged buyout or bankruptcy, it will immediately notify STATE FARM of the changes. LYNX also agrees immediately to notify STATE FARM of any condition that may jeopardize the fulfillment of LYNX's contractual obligations to STATE FARM.

47.   BANKRUPTCY FILING OR INABILITY TO PAY DEBTS

LYNX acknowledges and agrees that should it admit in any written notice to STATE FARM, or in any public notice of any type, an inability to pay its debts as they become due, or is generally not paying its debts as they mature, or if LYNX files a voluntary petition in bankruptcy, or files a petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar arrangement under any present or future statute, law or regulation, or files an answer admitting the material allegations of a petition filed against LYNX, or if LYNX consents to or acquiesces in the appointment of a custodian, trustee, receiver, or liquidator of itself, or of all or any substantial part of its assets or properties, or if LYNX, or its shareholders take any action looking to the dissolution or liquidation of LYNX, or if an order for relief is entered against the LYNX under federal bankruptcy laws, then STATE FARM may in its sole discretion terminate this Agreement upon at least 30 days written notice to LYNX with no further financial obligation under this Agreement to LYNX other than payment for any prior Services performed by LYNX as authorized by STATE FARM prior to the termination date.

49.   GRATUITIES.

a.   LYNX will not offer any gratuities of any type, directly or indirectly, to any STATE FARM employee, agent, policyholder, or members of their respective families that others could view as influencing the actions or decisions of the recipient, or as prompting the recipient to endorse or favor the LYNX.

b.   LYNX further agrees that it will notify STATE FARM immediately if any STATE FARM employee, or STATE FARM agent, or STATE FARM policyholder, or a member of their respective families solicit or accept from LYNX any such gratuities, including but not limited to the reduction or forgiveness of a STATE FARM policyholder insurance dollar amount deductible.

50.   E-COMMERCE TRANSACTIONS.

a.   Automated eRouting. LYNX and STATE FARM acknowledge that both parties want to automate certain operations for purchase and sale transactions ("Transactions") by transmitting and receiving documents ("Documents") electronically in substitution for conventional paper-based documents ("eRouting"). Examples of Documents include, but are not limited to: catalogues; purchase orders ("PO"); acknowledgements; modifications to POs; advance ship notices; invoices; change orders; requests for proposal; discount acceptance notices; and proposals.

b.   Validity and Enforceability. LYNX and STATE FARM further agree that eRouting of Documents and Transactions shall have the same validity and enforceability as if the original paper-based document had been sent or received.

(CL Form 9400, rev. 02/06)                    -23-

#2000010319

c.    Paper-Based Invoices. LYNX and STATE FARM further acknowledge that STATE FARM at its sole discretion may reject paper-based invoices once any use of Provider Network begins.

51.    TRANSITION SERVICES.

a.    In the event of the expiration or termination of this Agreement for any reason, for a period of up to one (1) year, LYNX shall continue to provide the Services requested by STATE FARM that were provided by LYNX prior thereto and any additional Services to STATE FARM, or its designee, as applicable, including providing training in the performance of the affected Services to STATE FARM or third party personnel ("Transition Services").

b.    Without limiting the foregoing, the parties shall execute a amendment covering such Transition Services at the rates for Services set forth in the expiring/terminating Agreement or if new Services are added, at LYNX's then list prices, and LYNX shall provide the specific Transition Services as set forth in the applicable amnendment.

c.    STATE FARM's payment for Transition Services does not prejudice any rights STATE FARM may have under this Agreement.

d.    Notwithstanding any termination or expiration of this Agreement, the terms and conditions of this Agreement shall remain in effect during any period of Transition Services.

52.    FORCE MAJEURE.  Neither party shall be liable for any delays in performance hereunder due to circumstances beyond its control including, but not limited to, acts of nature, acts of governments, delays in transportation, and delays in delivery or inability of suppliers to deliver. STATE FARM shall have the option to terminate any and all obligations under this Agreement as amended by so notifying LYNX in writing if the delay in performance exceeds thirty (30) days from the originally agreed upon performance date.

53.    CHOICE OF LAW.  This Agreement shall be governed by the laws of the State of Illinois without regard to its conflict of law rules.

54.    WORK ORDERS.  The parties agree that the  provisions of this Agreement shall apply to all Work Orders and control over any inconsistent terms or conditions in the Work Orders.

55.    SURVIVAL.  The following sections shall survive termination of this Agreement:  Confidentiality, Retention and Destruction of State Farm Information, Applicability to Subcontractors, Use of State Farm Name, Ownership, Infringement Indemnification, Mutual Hold Harmless, Direct Damages for Security Breach, Mutual Limitation of Liability, Compliance, Security, Security Incident Notification and Response, Audit, Notices, Independent Contractor, Taxes, Mediation, Billing Record Review, Parent Guaranty, Letter of Credit, Transition Services, Choice of Law, and Survival.

#2000010319

This Agreement (and any attachments, exhibits, addenda, and Work Orders thereto) shall be the complete and exclusive statement of the agreement between the parties as to the subject matter of this Agreement, superseding all prior agreements regarding the subject matter of this Agreement, and shall be binding upon each of the parties hereto, their respective successors, and to the extent permitted their assigns. This Agreement cannot be amended or otherwise modified, except as agreed to in writing by each of the parties hereto. In the event of any conflicts between this Agreement and any Work Order, the terms of this Agreement shall prevail.

**LYNX SERVICES, L.L.C.**

████████████████████

---
Signature

TONY AQUILA
_____
Printed or Typed Name

CHAIRMAN AND CEO
_____
Title

JUNE 27, 2017
_____
Date

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY**

████████████████████

---
Signature

Michael Tipsord
_____
Printed or Typed Name

Chairman, President & CEO
_____
Title

June 30, 2017
_____
Date

(CL Form 9400, rev. 02/08)                    -25-