E-FILED
Tuesday, 13 October, 2026 12:29:19 PM
Clerk, U.S. District Court, ILCD

**IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION**

LYNX SERVICES, LLC,
Plaintiff,

v.

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY; SAFELITE GROUP, INC.; SAFELITE SOLUTIONS, LLC,
Defendants.

Case No. 1:25-cv-1251-JEH-RLH

**Order**

Now before the Court is the Defendant State Farm Automobile Insurance Company's Motion to Dismiss (D. 73) and the Defendants Safelite Group, Inc. and Safelite Solutions, LLC's Motion to Dismiss (D. 76).[1] For the reasons stated *infra*, the motions are DENIED.

**I**

On June 27, 2025, the Plaintiff Lynx Services LLC (Lynx) filed a Complaint against State Farm Mutual Automobile Insurance Company (State Farm), Safelite Group, Inc., and Safelite Solutions LLC (Safelite, collectively). (D. 2). On June 26, 2026, Lynx filed its First Amended Complaint. (D. 66). On August 3, 2026, State Farm filed a Motion to Dismiss. (D. 73). On August 17, 2026, Lynx filed a Response. (D. 81). Also on August 3, 2026, Safelite filed a Motion to Dismiss. (D. 76). On August 17, 2026, Lynx filed a Response, and on August 28, 2026, Defendant Safelite filed a Reply. (D. 84; D. 92). The matter is now fully briefed.

[1] Citations to the electronic docket are abbreviated as "D. ___ at ECF p. ___."

## II

According to Lynx's Amended Complaint, Lynx is a contact center solutions provider specializing in delivering reliable, technology-driven customer service and claims management support within the automotive and insurance sectors.[2] One of the services Lynx offers is its Glass Program, which is a comprehensive system for helping insurance companies manage their auto glass claims by contracting with insurance companies that wish to utilize Lynx's network of auto glass service provider companies.

### A

Lynx pleads ownership to three trade secrets that Lynx developed to effectively pair insurance companies with the most affordable glass providers: Trade Secret A, Trade Secret B, and Trade Secret C.

#### 1

Trade Secret A is the compilation of profile information from auto glass service providers maintained in Lynx's METRYX® Industry Services Registry ("METRYX"). METRYX is a customized platform that Lynx developed after years of observing how auto glass service providers and the insurance industry operate. METRYX is a web-based, password-protected application hosted on Lynx's website that provides auto glass service providers with the opportunity to register and maintain their capabilities in a profile. Lynx created METRYX to provide insurance customers with more complete information concerning auto glass service providers to make better informed choices based on the services offered by

[2] The Court assumes the facts alleged in the Amended Complaint are true for purposes of the motions to dismiss, without, of course, making any finding as to whether the alleged facts are in fact true. Additionally, this Court intentionally limits its description of Lynx's Trade Secrets B and C because most of the Trade Secrets B and C information in the Amended Complaint is sealed. While the Court does not describe Trade Secrets B and C in the same detail as the Amended Complaint, for the purposes of considering these motions to dismiss, the Court assumes the Trade Secrets B and C information in the Amended Complaint is true.

qualified providers. With METRYX, auto glass service providers and insurance companies can accurately represent their glass service providers' capabilities to policyholders who report a glass loss.

One benefit that METRYX provides Lynx's auto glass service providers is that the provider does not need to directly submit profile information to individual participating insurance companies to service their claims. Instead, an auto glass service provider that wants to participate in any glass program managed by Lynx need only complete one METRYX profile. That same information is used for all glass programs for which the provider is enrolled and is not for the benefit of just one insurance company's glass program. In other words, METRYX data that Lynx collected is compiled on behalf of all of Lynx's customers.

Another benefit METRYX provides is in the specific profile data fields developed using METRYX application logic during the process of creating (or updating) the auto glass provider's profile. These highly confidential and proprietary data fields are subsequently used to drive pricing decisions that have saved Lynx's insurance customers millions. Importantly, these proprietary data fields, along with the remainder of the auto glass service provider's profile, are required in the METRYX system to create a complete auto glass service provider profile. An auto glass service provider using METRYX cannot apply to be a part of a specific insurance company's glass program through Lynx until its company profile in the METRYX system is complete. As such, the METRYX system includes a complete and proprietary compilation of glass providers that can be used to assist policyholders in contacting a qualified auto glass service provider, to expedite payments to the glass service providers, and to save insurance companies millions of dollars in indemnity impact.

The entire compilation of data that Lynx maintains about the glass service providers in METRYX is substantial, and it includes without limitation: company

name, address, phone number, hours of operation, whether a mobile service is offered, the service area, the types of repairs offered, technician credentials, technician qualifications, relevant training, mobile capabilities, and related information. This compilation of profile information from glass service providers goes well beyond what is publicly available. Over decades, through Lynx's marketing and sales efforts, the METRYX registry grew to a compilation of thousands of high-quality, detailed profiles of glass service providers.

**2**

Trade Secret B is a subset of the Trade Secret A data. Specifically, Trade Secret B is a process designed by Lynx that uses some of the Trade Secret A data to effectively identify the best price for glass services in a particular area. Trade Secret B's information represents the most competitive pricing available in a given area, allowing Lynx to provide competitive features for its services. Lynx's Trade Secret B has a substantial impact on indemnity costs, benefiting Lynx's insurance customers. Lynx did not develop this information specifically for one insurance company. Rather, all Lynx customers benefit from Trade Secret B.

**3**

Trade Secret C is the pricing strategy itself. METRYX uses a specific pricing strategy that allows specific pricing decisions to be made in a way that makes the entire industry more efficient and fair. Trade Secret C was developed by Lynx as a part of the three-year development effort to change the way auto glass service providers were managed. Prior to the launch of Trade Secret C, insurance pricing was based on the actual location of service centers, which incentivized centers to lower their pricing by purposely locating those service centers to rural areas adjacent to urban areas. When Lynx launched the program in August of 2005, it was the first such combination of data and pricing methodology in the industry, and it is unique in the industry today. Much like Trade Secrets A and B, Trade

Secret C has saved Lynx's insurance customers millions of dollars in indemnity impact.

**4**

Lynx's trade secrets are confidential and proprietary. Trade Secrets A, B, and C are not generally known or readily ascertainable to the public. Instead, Lynx only provides limited access to these trade secrets to authorized insurance companies and glass service providers that enter into agreements with Lynx. With respect to auto glass service providers, Lynx provides access only to a provider's own profile through a password-protected account. Even after authentication with a password, auto glass service providers can only access their account and cannot access any of the thousands of other profiles comprising the rest of the METRYX registry.

An auto glass service provider interested in creating a METRYX profile must accept METRYX's Terms and Conditions of Use. These Terms and Conditions outline how Lynx will handle the auto glass service provider's confidential information. Except for disclosure to third parties to audit and verify the information provided by an auto glass service provider, Lynx keeps the personal information provided by auto glass service providers in METRYX private and only shares it with third parties under limited circumstances. Other than providing an auto glass service provider's confidential information to insurance companies contracted with Lynx, the only other circumstances in which Lynx may share an auto glass service provider's information are (1) if it is necessary to protect Lynx's rights or property; (2) if it is necessary for Lynx to enforce the terms of use it has entered with the auto glass service provider; (3) if Lynx is compelled by law enforcement officials or judicial authorities to provide information on individual users; or (4) if doing so is necessary for public safety.

Only a small, authorized team from Lynx has access to the technician and vehicle authentication information to manage reported duplications and to facilitate verification with the appropriate agencies. Lynx limits the number and types of employees who can access METRYX and requires these employees to undergo special security training before receiving access to its trade secrets. A similarly small team from Lynx's insurance company clients can also access technician and vehicle information for purposes of managing the program, pursuant to an agreement between Lynx and the insurance company. Lynx only provides insurance companies access to its confidential information and trade secrets under strict terms of confidentiality governed by Lynx's agreements with these insurance companies. To the extent that any third parties receive Lynx's information for verification purposes, Lynx takes reasonable measures to protect this information.

Lynx's confidential information and trade secrets can be discerned from the METRYX system, which is password protected and requires authorized users to login to access Lynx's information. Lynx also routinely performs security audits. Lynx complies with industry standards for securing its information; it is SOX compliant and ISO certified in information security. Lynx also takes procedural and technological measures to protect an auto glass service provider's information from loss, misuse, alteration, and destruction, and Lynx asks that any third party to whom Lynx may transfer an auto glass service provider's information take comparable steps to protect the security of this information.

**B**

For more than nearly thirty years, Lynx administered State Farm's glass claims. During the latter part of this long period, State Farm obtained substantial profits by utilizing Lynx's information and pricing strategies to process its

policyholders' auto glass claims. Lynx's use of Trade Secrets A, B, and C saved State Farm millions of dollars.

The most recent agreement between State Farm and Lynx is titled State Farm Glass Claims Services Out-Tasking Agreement (#2000010319) (the "Agreement"). This Agreement was executed by State Farm and Lynx in June 2017 and became effective on July 1, 2017. Under the Agreement, Lynx agreed to administer State Farm glass claims for State Farm policyholders using its professional capabilities and physical assets and according to State Farm's Glass Claims Services Business Rules; State Farm's Payment Process to Lynx; and Call Center Infrastructure and Requirements.

In Section 5(a) of the Agreement, State Farm acknowledges that during performance of the Agreement, it "may learn or have access to certain confidential, . . . trade secret, proprietary or other like information or products of [Lynx] or of third parties[.]" Under this Section, State Farm also agreed to "keep strictly confidential" Lynx's trade secrets and other confidential information. Accordingly, State Farm is aware that Lynx considers the information it provided to State Farm under the Agreement, including the trade secrets described above, to be confidential and proprietary.

**C**

State Farm announced hiring Safelite (Lynx's direct competitor) as its new glass claims administrator effective July 1, 2025, and subsequently terminated its relationship with Lynx. Despite the change in glass claims administrators, State Farm represented to its National Auto Glass Shop participants that "[t]here would be no changes" to State Farm's National Glass Program. (D. 66 at ECF p. 14).

Safelite, through its experience competing with Lynx in this industry, knew that Lynx had complied a valuable collection of verified information about auto glass service providers through Lynx's proprietary systems, that Lynx used a

proprietary pricing strategy, and that State Farm had access to that information. Safelite knew that State Farm would view Safelite as a more attractive third-party administrator if Safelite could use Lynx's information and strategy to save State Farm substantial amounts in indemnity costs.

State Farm agreed to continue using and to disclose Lynx's confidential information and trade secrets since it stood to benefit financially from Safelite's use of Lynx's data to make pricing determinations. As both the largest auto glass service provider and the largest third-party administrator of glass insurance claims in the industry, Safelite knew or should have known that the information State Farm shared originated with Lynx, constituted Lynx's confidential information and trade secrets, and was subject to Lynx's confidentiality protections. Safelite nonetheless accepted, retained, and used that information.

State Farm admitted to sharing Lynx's information with Safelite. State Farm disclosed substantial volumes of data containing proprietary and confidential data from reports that Lynx routinely provided State Farm during the term of the Agreement.

State Farm's announcement that in replacing Lynx with Safelite "[t]here will be no changes" caused Lynx grave concern about its proprietary information and trade secrets, resulting in Lynx reaching out to State Farm to discuss State Farm's confidentiality obligations under the Agreement. Lynx told State Farm that its announcement signaled an intent to improperly use and leverage Trade Secrets A, B, and C. Lynx also discussed these concerns with Mr. Eric Thomas—an attorney—at State Farm. Mr. Thomas's response was that any information that Lynx shared with State Farm was owned by State Farm. Mr. Thomas and other State Farm representatives also confirmed that Lynx's information has or will be shared without Lynx's consent.

State Farm has continued to use Lynx's trade secret and confidential information and has shared, plans to share, and/or will inevitably share Lynx's confidential, proprietary, and trade secret information with Safelite. In an effort to limit the damage from State Farm's continued use, Lynx also wrote to Safelite demanding that it cease and desist from its misappropriation of Lynx's trade secrets and making it clear that State Farm's unauthorized use and disclosure of Lynx's information to Safelite was improper and done without Lynx's consent. Both State Farm and Safelite have refused to return all Lynx's confidential information to Lynx.

Lynx received confirmation of State Farm and Safelite's misappropriation when Safelite sent out a "new" National Offer and Acceptance Agreement to auto glass service providers. That "new" agreement expressly includes Trade Secret C as a program requirement and requested that these auto glass service providers—which are customers of Lynx—sign the new agreement. The "new" agreement describes Trade Secret C in identical terms as the agreement that Lynx signed with auto glass service providers. In response, Lynx commenced this action against State Farm and Safelite.

**III**

Federal Rule of Civil Procedure 12(b)(6) governs whether a complaint fails to state a claim. FED. R. CIV. P. 12(b)(6). Federal Rule of Civil Procedure 8(a)(2) provides that a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief". FED. R. CIV. P. 8(a)(2). A "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at

663. A plaintiff "must give enough details about the subject-matter of the case to present a story that holds together." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555 (2007)). Similarly, a complaint that "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" will not survive a motion to dismiss. *Id.* The Court is to draw all reasonable inferences in favor of the non-movant, but the Court "need not accept as true any legal assertions or recital of the elements of a cause of action 'supported by mere conclusory statements.'" *Vesely v. Armslist LLC*, 762 F.3d 661, 665–66 (7th Cir. 2014) (quoting *Alam v. Miller Brewing Co.*, 709 F.3d 662, 666 (7th Cir. 2013)).

**A**

In Count III, Lynx alleges that State Farm misappropriated Lynx's Trade Secrets A, B, and C in violation of the Defense of Trade Secrets Act ("DTSA"). (Doc. 66 at ECF pp. 19–22). In Count IV, Lynx similarly alleges that State Farm violated the Illinois Trade Secrets Act ("ITSA"). *Id.* at ECF pp. 23–26. For the purposes of ruling on State Farm's motion to dismiss, the Court considers the two Counts together "because the elements of a claim arising under those statutes are the same." *Allstate Ins. Co. v. Ameriprise Fin. Serv. Inc.*, No. 17-cv-5826, 2023 WL 5334638, at *11 (N.D. Ill. Aug. 18, 2023) (citing *Next Payment Sols., Inc. v. CLEAResult Consulting, Inc.*, No, 17 C 8829, 2019 WL 955354, at *72 n.13 (N.D. Ill. Feb. 27, 2019)).[3] Under either, a Plaintiff "must show (1) the existence of a trade secret, and (2) that the defendant misappropriated that trade secret." *Allstate Ins. Co*, No. 17-cv-5826, 2023 WL 5334638, at *11. State Farm argues that Lynx failed to allege facts that plausibly suggest the existence of Trade Secrets A, B, and C. (D.

[3] The parties agree that the DTSA or the ITSA are materially the same, and the Court can analyze claims brought under the DTSA and ITSA together. (D. 73 at ECF p. 14; D. 81 at ECF p. 11).

73 at ECF pp. 14–22). In turn, the Court focuses on the first element: whether a trade secret exists.

Under the DTSA, a trade secret is defined in relevant part as:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if--
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information;

18 U.S.C. § 1893(3).

Under the ITSA, a trade secret means:

> information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:
> (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and
> (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 ILL. COMP. STAT. § 1065/2(d).

"To establish a protectable trade secret under either statute, the party seeking protection must show that the information: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." *Inmar Inc. v. Vargas*, No. 18-cv-2306, 2018 WL 6716701, at *3 (N.D. Ill. Dec. 21, 2018) (citing *PrimeSource Bldg. Prod., Inc. v. Huttig Bldg. Prod., Inc.*, No. 16 CV 11390, 2017 WL 7795125, at *13 (N.D. Ill. Dec. 9, 2017)). "The existence of a trade secret ordinarily is a question of fact." *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 723 (7th Cir. 2003). "A trade secret 'is one of the most elusive and difficult concepts in the law to define.'" *Id.* (citing *Lear Siegler, Inc. v. Ark-Ell Springs, Inc.*, 569 F.2d 286, 288 (5th Cir. 1978)). "In many cases, the existence of a trade secret is not obvious; it requires an ad hoc evaluation of all the surrounding circumstances." *Id.*

**1**

In arguing that Lynx failed to plead Trade Secret A as an enforceable trade secret, State Farm presents three arguments: (1) Lynx is not the owner of Trade Secret A; (2) Trade Secret A does not qualify as a trade secret because it is public information; and (3) Trade Secret A does not qualify as a trade secret because Lynx failed to take reasonable efforts to maintain its secrecy.

At the motion to dismiss stage, the bar for pleading a trade secret is low. "[T]o survive a motion to dismiss, a complaint need only identify the alleged trade secret in a general sense." *Invado Pharms., Inc. v. Forward Sci. Distribution LLC*, No. 18 C 2515, 2018 WL 5013556, at *3 (N.D. Ill. Oct. 16, 2018). Only in "the most extreme cases" is dismissal of a trade secret claim warranted "for lack of specificity on the pleadings". *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 558, 573

(N.D. Ill. 2019) (quoting *Fire 'Em Up, Inc. v. Technocarb Equip. (2004) Ltd.*, 799 F.Supp.2d 846, 850 (N.D. Ill. 2011)).

**a**

First, State Farm argues that Lynx failed to sufficiently plead that Lynx, and not State Farm, is the owner of Trade Secret A. Specifically, State Farm argues that the Agreement between State Farm and Lynx unambiguously defines State Farm as Trade Seret A's owner. State Farm notes that interpreting an unambiguous contract provision "is a question of law that can be decided at the motion to dismiss stage." *Illinois ex rel. Hammer v. Twin Rivers Ins.*, No. 16 C 7371, 2017 WL 2880899, at *4 (N.D. Ill. July 5, 2017) (citation omitted).

Section 13(d) of the Agreement contains the following unambiguous language: "STATE FARM retains all ownership rights in any and all STATE FARM Information . . . that . . . LYNX acquires, collects, or generates on behalf of STATE FARM." (D. 66 at ECF pp. 49–50). State Farm reasons that because Lynx pleaded that Lynx compiled the Trade Secret A database "on behalf of all LYNX's customers", and because State Farm is one of Lynx's customers, Trade Secret A was created on State Farm's behalf, which according to the Agreement, makes State Farm the owner. (D. 73 at ECF p. 15 (citing D. 66 at ECF 7)). The Court disagrees because State Farm's argument conflicts with Lynx's pleadings, is not supported by the syntax of § 13(d), and creates an absurd result.

As a preliminary matter, this Court agrees with State Farm that § 13(d) of the Agreement is unambiguous. *See Lewitton v. ITA Software, Inc.*, 585 F.3d 377, 379–80 (7th Cir. 2009) (holding the Court determines whether a contract is ambiguous; an ambiguous contract "is susceptible to more than one interpretation"; and unambiguous contracts must be enforced as written). State Farm is also correct that an unambiguous contract is a question of law that can be decided on a motion to dismiss. *Federalpha Steel LLC Creditors' Tr. v. Fed. Pipe &*

*Steel Corp.*, 368 B.R. 679, 688–89 (N.D. Ill 2007) ("[T]he interpretation of an unambiguous contract is a question of law that can be decided at the motion to dismiss stage."). After all, contract interpretation in Illinois is concerned with the four corners of the document. *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 878 (7th Cir. 2005) ("Illinois adheres to a 'four corner rule' of contract interpretation, which provides that an agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it.") (internal citations omitted). Further investigation and discovery is irrelevant to the interpretation of an unambiguous contract. *See id.* ("[The agreement] speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changes by extrinsic evidence.") (internal citations omitted).

To interpret §13(d), the Court starts with the full contract provision as it appears in the Agreement:

> As between STATE FARM and LYNX, *STATE FARM retains all ownership rights in any and all STATE FARM Information*, including but not limited to Personal Data, that STATE FARM provides or transmits to LYNX or *that LYNX acquires, collects or generates on behalf of STATE FARM*.

(D. 66 at ECF 49–50) (emphasis added).

First, this Court disagrees with State Farms's argument because it conflicts with Lynx's pleadings. Specifically, this Court disagrees that "compiling on behalf of *all Lynx's customers*" necessarily equals "compiling on behalf of *State Farm*." State Farm's argument ignores Lynx's pleaded facts and other portions of the Agreement.

For example, the Agreement also unambiguously states, "All LYNX materials *that predate the Agreement shall remain LYNX's property*", and "LYNX grants STATE FARM a limited nonexclusive, royalty-free, license to use LYNX's

preexisting materials for STATE FARM's internal use only in the performance of this Agreement." (D. 66 at ECF p. 49) (emphasis added). This Agreement was executed by State Farm and Lynx in June 2017 and became effective on July 1, 2017. (D. 66 at ECF p. 13). Accordingly, any Trade Secret A information that Lynx complied prior to July 1, 2017, would be owned by Lynx as materials that predate the Agreement, and State Farm had a license to use that information during the term of the Agreement. Lynx pleaded that the Trade Secret A information "grew to a compilation of thousands of high-quality, detailed profiles" due to Lynx's efforts "[o]ver decades". (Doc. 66 at p. ECF 8). If Lynx developed Trade Secret A for "decades", Lynx compiled (at least some of) Trade Secret A prior to the Agreement in 2017, which was less than a decade ago. State Farm's argument that Trade Secret A was made on behalf of State Farm is contrary to Lynx's factual pleadings. Lynx's pleadings plausibly suggest that Trade Secret A predated the Agreement, making Lynx the owner.

Second, this Court disagrees with State Farm's argument because it is not supported by the syntax of § 13(d).[4] The independent clause in § 13(d) states, "STATE FARM retains". The verb "retains" is key to interpreting § 13(d). According to Webster's Dictionary, "retains" means "to keep in possession or use." *Retain*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/retains (last visited Oct. 5, 2026). Notably, "retains" implies maintaining existing possession, not creating new possession.

This plain-meaning definition of "retains" ultimately destroys State Farm's argument. State Farm cannot *retain* ownership of the Trade Secret A data that Lynx

---

[4] "Words are to be given the meaning that proper grammar and usage would assign them." Antonin Scalian & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 140 (2012). "State Farm retains" is the independent clause in § 13(d). This independent clause is followed by the following prepositional phrases: "all ownership rights in any and all STATE FARM Information", which limit the type of information State Farm can retain.

created because State Farm never owned the Trade Secret A data. As discussed above, Lynx pleaded that Trade Secret A existed before the Agreement between State Farm and Lynx. The Trade Secret A data that predates the Agreement was always owned by Lynx, and State Farm only had a license to use that data during the term of the Agreement. Section 13(d) cannot be construed to transfer ownership from Lynx to State Farm because § 13(d) only allocates rights in what State Farm already owned.

Data that Lynx added to Trade Secret A during the term of the Agreement, however, presents a more difficult question. Lynx correctly notes that the Agreement does not include an assignment clause or a work-made-for-hire clause. (D. 81 at ECF p. 15). Additionally, the prepositional phrases "in any and all STATE FARM Information" act as a limitation on the type of ownership rights that State Farm retains under § 13(d). The phrase, "STATE FARM Information" is defined earlier in the contract as "Information of STATE FARM ***and*** its third parties." (D. 66 at ECF p. 45) (emphasis added). Meaning, § 13(d) only refers to State Farm retaining information of State Farm and its third parties. The Agreement says "and," not "or."

The Court has a difficult time imagining how Trade Secret A, including the data added during the Agreement's term, could qualify as State Farm Information in light of Lynx's pleadings. Lynx's Amended Complaint explains that Trade Secret A is the compilation of profile information from auto glass service providers maintained by Lynx. (D. 66 at ECF p. 7). Because Lynx's business is the connection between State Farm's policyholders and the auto glass service providers, the auto glass service providers create a profile with Lynx, not State Farm. *Id.* Lynx's pleading demonstrates that Lynx's business model is designed to separate the auto glass service providers from State Farm. State Farm's lack of involvement with the glass providers, however, makes it difficult for this Court to imagine how Lynx's

glass providers could possibly qualify as "STATE FARM Information." Lynx's pleadings plausibly suggest that Trade Secret A is not "STATE FARM Information," meaning § 13(d) would not apply to Trade Secret A.

Finally, this Court disagrees with State Farms's leap that the "all Lynx's customers" line in Lynx's pleading necessarily equals "State Farm" because that interpretation creates absurd results. The full portion of Lynx's Amended Complaint reads: "[Trade Secret A] is used for all glass programs for which the provider is enrolled and is *not for the benefit of just one company's glass program*. In other words, [Trade Secret A] data that LYNX collected is compiled on behalf of all of LYNX's customers." (D. 66 at ECF p. 7) (emphasis added). Reading this pleading in Lynx's favor, the pleading alleges that Trade Secret A was developed for Lynx's business, which happens to be in the service industry and serves State Farm, among others. Accordingly, State Farm's leap creates two absurd results. First, State Farm could theoretically own information in Trade Secret A that was developed "on behalf of all Lynx's clients" but was never developed for State Farm's use. Second, all of Lynx's clients, and not Lynx, would collectively and separately own the information in Trade Secret A (assuming this same language is in all Lynx's Agreements like Lynx argues in its Response). (D. 81 at ECF p. 13).

In conclusion, this Court disagrees that the Agreement unambiguously grants State Farm ownership to Trade Secret A. To the contrary, Lynx's Amended Complaint paired with the Agreement sufficiently plead Lynx as the owner of Trade Secret A.

**b**

Second, State Farm argues that Lynx failed to sufficiently plead that Trade Secret A qualifies as a trade secret because the information in Trade Secret A is all public record.

In *AW Dynamometer Inc. v. Shop Dog Industries*, this Court denied a motion to dismiss holding data and customer lists can qualify as trade secrets. No. 1:24-cv-01469-JEH-RLH, 2025 WL 175681, at *4 (C.D. Ill. June 25, 2025). The data list included publicly available information like names and contact information, but the list also included "all prior sales and service information". *Id.* This Court considered the extensive developmental costs, as well as the information contained. *Id.* When considering whether data compilations are a trade secret, courts often consider developmental costs, like time and money. *See Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 728 (7th Cir. 2003).

Here, Lynx pleaded that Trade Secret A includes "information concerning an auto glass service provider's capacity, service offerings, professional qualifications, and credentials." (Doc. 66 at ECF p. 7). Moreover, the entire compilation of Trade Secret A "is substantial, and it includes without limitation: company name, address, phone number, hours of operation, whether a mobile service is offered, the service area, the types of repairs offered, technician qualifications, relevant training, mobile capabilities, and related information" that "goes well beyond what is publicly available." *Id.* at ECF p. 8. Lynx's Amended Complaint also pleads the extensive developmental costs saying, "Over decades, through LYNX's marketing and sales efforts, [Trade Secret A] grew to a compilation of thousands of high-quality, detailed profiles of glass service providers." *Id.* Lynx sufficiently pleaded that Trade Secret A goes beyond public information that cannot qualify as a trade secret.

**c**

Third, State Farm argues that Lynx failed to sufficiently plead reasonable efforts to maintain Trade Secret A's secrecy. State Farm cites *G.R.P. Mechanical Co.*, which held that protecting information through passwords and a VPN is relevant but insufficient to place someone on notice that information is a trade secret. *G.R.P.*

*Mechanical Co. v. Greenlight Design Partners, LLC*, No. 26-cv-1023, 2026 WL 1725842, at *4 (C.D. Ill. June 15, 2026).

Lynx's pleadings, however, go beyond password and VPN protection. Lynx does not make Trade Secret A accessible to the public in any way and only provides access to authorized insurance companies and glass service providers that enter into agreements with Lynx. (D. 66 at ECF p. 11). While glass service providers have some access after password authentication, their access is limited to their own profile, and their access is contingent on accepting a "Terms and Conditions of Use" outlining the confidentiality of Trade Secret A. *Id.* at ECF p. 12. Additionally, "Lynx limits the number and type of employees who can access [Trade Secret A] and requires those employees to undergo special security training before receiving access to its trade secrets." *Id.* at ECF p. 13. Lynx's insurance company clients only have access to Trade Secret A under strict terms of confidentiality outlined in agreements between Lynx and the insurance companies. *Id.* at ECF p. 12. For example, the confidentiality provision between Lynx and State Farm reads:

> The parties expressly acknowledge that in the course of their performance hereunder, they may learn or have access to certain confidential, patent, copyright, business, trade secret, proprietary or other like information or products of the other party or of third parties, (for example, *the other party's vendors, suppliers* or customers) . . .

(D. 66 at ECF 44). Furthermore, "LYNX also routinely performs security audits. LYNX complies with industry standards for securing its information; it is SOX compliant and ISO certified in information security." *Id.* at ECF p. 13.

In conclusion, Lynx sufficiently pleaded reasonable methods to maintain the secrecy of Trade Secret A and provided notice to State Farm of Trade Secret A's confidentiality.

**2**

In arguing that Lynx failed to plead Trade Secret B as an enforceable trade secret, State Farm presents two arguments: (1) Lynx is not the owner of Trade Secret B and (2) Trade Secret B does not qualify as a trade secret because Lynx failed to take reasonable efforts to maintain its secrecy. Trade Secret B is part of Lynx's Trade Secret A. Consequently, the Trade Secret A analysis for ownership and secrecy apply to Trade Secret B as well.

Unique to Trade Secret B, State Farm argues that Lynx cannot be the owner of Trade Secret B because the data in Trade Secret B was specified by the glass companies or by State Farm, and Lynx does not specify the data. State Farm's allegation of Lynx's lack of involvement with Trade Secret B are contrary to Lynx's Amended Complaint. (D. 73 at ECF pp. 18–19). While both the glass companies and State Farm specify data in Trade Secret B, Trade Secret B, as created by Lynx, systematically defines, organizes, and applies the data to produce the information that is valuable to State Farm and saves State Farm money. (D. 66 at ECF pp. 9–10, 71).[5] Lynx's Amended Complaint certainly pleads that Trade Secret B is more than a vault where glass companies and State Farm deposit data. The pleadings demonstrate that Trade Secret B's value is not the data imputed, but the systematic defining and sorting of that data, which is the fruit of Lynx's design and development. *Id.* The referenced pleadings also overcome State Farm's argument that Trade Secret B does not qualify as a trade secret. In conclusion, Lynx sufficiently pleaded the existence of Trade Secret B.

---

[5] This Court notes that most of the briefing regarding Trade Secret B is sealed. (D. 73 at ECF pp. 18–19; D. 81 at ECF pp. 19–20). In an attempt to respect the parties' desire to protect the details of Trade Secret B, the factual descriptions in this Order are intentionally broad.

**3**

Finally, State Farm argues that Lynx failed to plead Trade Secret C as an enforceable trade secret. State Farm presents three arguments: (1) Trade Secret C is too simple to qualify as a trade secret, (2) Lynx is not the owner of Trade Secret C, and (3) Lynx did not take reasonable efforts to inform State Farm of Trade Secret C's secrecy. In making these arguments, State Farm cites this Court's preliminary injunction ruling. That is not persuasive. The standard at preliminary injunction is much higher and considers the likelihood on the merits. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). By contrast, the standard for a motion to dismiss is much lower and only considers whether the plaintiff pleaded a plausible claim (when every inference in the plaintiff's favor). *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

State Farm's first argument, that Trade Secret C is too simple to qualify as a trade secret, is based on *NEXT Payment Solutions, Inc. v. CLEAResult Consulting, Inc*. *See* 163 F.4th 1091, 1099 (7th Cir. 2026) ("something being 'new and valuable' does not itself render it a trade secret."). Unlike the dispute between Lynx and State Farm which is at the pleadings stage, *NEXT Payment Solutions* affirms a dismissal on summary judgment. *Id.* at 1093–94. State Farm's argument that Trade Secret C falls below the standard of an enforceable trade secret is premature, ultimately coming down to a factual dispute not to be resolved at this stage. *See Invado Pharms., Inc. v. Forward Sci. Distribution LLC*, No. 18 C 2515, 2018 WL 5013556, at *3 (N.D. Ill. Oct. 16, 2018) ("[T]o survive a motion to dismiss, a complaint need only identify the alleged trade secret in a general sense."); *see also Learning Curve Toys, Inc.*, 342 F.3d 714, 722 (7th Cir. 2003) ("The existence of a trade secret ordinarily is a question of fact."). Here, Lynx sufficiently pleads the existence of Trade Secret C. Trade Secret C is the METRYX Pricing Strategy that Lynx developed after three years of innovation. Trade Secret C remains unique

today and saved State Farm millions of dollars. (D. 66 at ECF pp. 10–11). State Farm's dispute regarding the sophistication of Trade Secret C is a factual dispute not to be resolved now.

State Farm's second argument, that Lynx is not the owner of Trade Secret C, also fails. State Farm argues that because Trade Secret C is detailed in an agreement between State Farm and its service providers, and because Lynx is not a party to those agreements, Lynx cannot be the owner of Trade Secret C. State Farm does not cite legal authority to support this position.[6] State Farm disclosing Trade Secret C in their agreements with vendors does not affect the ownership status of Trade Secret C. In fact, the Agreement between Lynx and State Farm accounts for this very scenario:

> STATE FARM and LYNX agree that, for the purposes of this Agreement, ***third parties whose duties for STATE FARM***, or as a subcontractor for Lynx in performing LYNX's duties under this Agreement, ***require access to the Information***[7] provided under this Agreement ***shall have access to the Information*** as required by such duties, ***provided that***: (i) ***such parties have agreed in writing*** with either STATE FARM or LYNX in terms no less protective than the confidentiality obligations of this Agreement***, to keep confidential the Information***; (ii) such third parties have agreed in writing with either STATE FARM or LYNX not to use the Information for their own benefit or the benefit of any person or entity besides STATE FARM; and (iii) when allowing such third parties access to Information, will not exceed the license or use restrictions in the Agreement..

(D. 66 at ECF p. 45) (emphasis added). Indeed, the agreements between State Farm and their vendors include the required confidentiality provisions:

---

[6] Lynx cites authority to the contrary. *See SKF USA, Inc. v. Bjerkness*, 636 F.Supp.2d 696, 713 (N.D. Ill. 2009) ("The fact that a company shares information with a customer does not mean the vendor does not attach importance to that information . . . So long as the information meets the requirements of confidential information . . . then the information may be treated as confidential regardless of what the customer ultimately does with the information.").

[7] State Farm concedes that it would be impossible for State Farm not to disclose Lynx's pricing term to the glass companies. (D. 73 at ECF p. 21).

> The parties expressly acknowledge that in the course of their performance hereunder, they may learn or have access to certain confidential . . . trade secret . . . or other like information or products of the other party or of third parties, including but not limited to the other party's vendors . . . ***Glass Company agrees not to use*** State Farm's or ***a State Farm third party's Information for its own benefit or the benefit of any person beside State Farm***.

(D. 66 at ECF p. 76). Given that Lynx allowed State Farm to share Trade Secret C with necessary parties and State Farm included the necessary confidentiality language, State Farm's disclosure does not disrupt Trade Secret C ownership at this stage. *See SKF USA, Inc. v. Bjerkness*, 636 F. Supp. 2d 696, 713 (N.D. Ill. 2009).[8] Lynx sufficiently pleaded ownership to Trade Secret C.

Finally, State Farm's argument that Lynx failed to plead reasonable efforts to keep Trade Secret C confidential fails. State Farm argues that paragraphs 31–34 of Lynx's Amended Complaint, which identify Trade Secret C, contain no allegations about protecting the information. (D. 73 at ECF p. 21). While true, if State Farm keeps reading the Amended Complaint, Lynx sufficiently pleaded reasonable efforts to maintain Trade Secret C confidentiality in paragraphs 35–45. (D. 66 at ECF pp. 11–13). Paragraphs 35–45 of Lynx's Amended Complaint fall under the heading "LYNX's Trade Secrets are Confidential and Proprietary". Lynx safeguards Trade Secret C in a similar manner to Trade Secrets A and B, and for the same reasons detailed above for Trade Secrets A and B, Lynx sufficiently pleaded reasonable efforts to maintain Trade Secret C's confidentiality (Trade Secret C is not generally known or readily ascertainable, can only be accessed by

[8] State Farm also argues that Lynx is not the owner of Trade Secret C because State Farm would indemnify Lynx against claims brought by third parties arising from Trade Secret C. (D. 73 at ECF p. 20). State Farm does not cite authority supporting this argument. *Id.* This Court disagrees that State Farm could manufacture ownership to Lynx's trade secret by offering to indemnify Lynx from litigation relating to the trade secret.

a limited group who signs confidentiality agreements, etc.). *Id.* Lynx sufficiently pleaded Trade Secret C.

In conclusion, State Farm's request to dismiss Count III, the DTSA claim, and Count IV, the ITSA claim, is denied.

**B**

In Count I, Lynx pleads breach of contract against State Farm, an Illinois common law cause of action. (D. 66 at ECF pp. 16–18). In Count II, Lynx pleads unjust enrichment, also an Illinois common law cause of action. *Id.* at ECF pp. 18–19. In the instant Motion, State Farm contends that Counts I and II are identical to Lynx's claims for misappropriation of trade secrets. For the reasons that follow, the Court agrees with Lynx that, at this stage, Counts I and II cannot be dismissed on preemption grounds.

**1**

State Farm argues that Lynx's breach of contract claim fails for the same reason that Lynx's DTSA and ITSA claims fail: State Farm, not Lynx, owns Trade Secrets A, B, and C. For the reasons stated above, Lynx sufficiently pleaded ownership of Trade Secrets A, B, and C, and State Farm's argument fails at this stage.

**2**

Next, State Farm argues that Lynx's unjust enrichment claim is (1) expressly preempted by the ITSA, and (2) not recognized as an independent cause of action under Illinois law and rises and falls with Lynx's breach of contract claim.

Lynx's unjust enrichment claim is not preempted by the ITSA because Lynx's unjust enrichment pleadings go beyond Lynx's ITSA pleadings. The ITSA "is intended to displace conflicting tort . . . laws of this State providing civil remedies for misappropriation of a trade secret." 765 ILCS § 1065/8(a). "[T]he ITSA forecloses claims 'when they rest on the conduct that is said to

misappropriate trade secrets.'" *REXA, Inc. v. Chester*, 42 F.4th 652, 670 (7th Cir. 2022) (quoting *Hecny Transp., Inc. v. Chu*, 430 F.3d 402, 404–05 (7th Cir. 2005)). Here, Lynx pleads, "State Farm received many benefits when it entered the Agreement with LYNX, including the use of LYNX's confidential information, certain of which was generated using Lynx's proprietary tools and certain of which constitute trade secrets." (D. 66 at ECF p. 19). Lynx pleads unjust enrichment to confidential information other than Trade Secrets A, B, and C.

Lynx's unjust enrichment claim is also not preempted by Lynx's breach of contract claim because the claims are pleaded in the alternative, making dismissal premature at this stage. "At the pleading stage, a party may plead breach of contract and unjust enrichment claims in the alternative." *Gociman v. Loy. Univ. of Chi.*, 41 F.4th 873, 886 (7th Cir. 2022). If the parties do not dispute the contract's existence, an unjust enrichment claim would not survive a motion to dismiss. *Id.* at 887. If the parties, however, dispute the validity *or scope* of the contract, the unjust enrichment claim may survive a motion to dismiss. *Id.* Here, the parties clearly dispute the scope of the Agreement, especially regarding trade secret ownership and the scope of the confidentiality provisions. Dismissal would be premature.

In conclusion, State Farm's request to dismiss Count I, breach of contract, and Count II, unjust enrichment, is denied.

**C**

In Count V, Lynx alleges that Safelite misappropriated Lynx's Trade Secrets A, B, and C in violation of the DTSA, and in Count IV, Lynx similarly alleges that Safelite violated the ITSA. (Doc. 66 at ECF pp. 27–37). These Counts mirror Lynx's Count III and Count IV against State Farm. Just as the Court considered Counts III and IV together, the Court considers Counts V and IV together. *See Allstate Ins. Co. v. Ameriprise Fin. Serv. Inc.*, No. 17-cv-5826, 2023 WL

5334638, at *11 (N.D. Ill. Aug. 18, 2023) (holding the elements of the DTSA and the ITSA are the same).

**1**

First, Safelite makes the same ownership argument as State Farm: The Agreement defeats Lynx's claims to Trade Secrets A, B, and C because the Agreement unambiguously shows State Farm, not Lynx, is the owner of the information in Trade Secrets A, B, and C. (D. 76 at ECF 13–16). Safelite, like State Farm, cites to § 13(d) of the Agreement, arguing that State Farm owns any information generated on State Farm's behalf, and consequently, the alleged trade secrets are owned by State Farm. For the same reasons stated above, this Court disagrees. *See supra* Sections III.A.1.a, 2, 3.

Safelite makes one ownership argument that is not raised in State Farm's motion. Safelite argues that the ownership argument is bolstered by the language in the Agreement referring to the Offer and Acceptance Program as "the STATE FARM National Offer and Acceptance Program". (D. 76 at ECF p. 15) (citing D. 66 at ECF p. 43). This argument does not change the Court's analysis because Lynx is not pleading that the Offer and Acceptance Program is Lynx's trade secret. Lynx sufficiently pleaded ownership of Trade Secrets A, B, and C.

Next, Safelite, also like State Farm, argues that Trade Secrets A, B, and C are not trade secrets as a matter of law. Safelite argues that Trade Secret A is not a trade secret as a matter of law because the information is publicly available. As discussed above, this argument fails, and Lynx sufficiently pleaded Trade Secret A. *See supra* Section III.A.1.b.

Safelite argues that Trade Secret B is not a trade secret as a matter of law because the information in Trade Secret B "is merely the unprotectible output of

an algorithm." (D. 76 at ECF p. 17).[9] Safelite relies on *Cotter* to support the proposition that algorithmic outputs cannot be sufficiently pleaded as protectible trade secrets. This Court disagrees. *See Cotter v. Lyft*, No. 13-cv-04065-VC, 2016 WL 36544545 (N.D. Cal. June 23, 2016). First, this case considers whether certain information can be filed under seal, which is a different analysis than a motion to dismiss considering the pleadings. *See id.* at *1. The court denied Lyft's request to file Lyft's revenue under seal, holding Lyft's revenue was not a trade secret even though the manner in which Lyft determines its revenue is a trade secret. *Id.* at *2. While in *Cotter* the "output" of the protected pricing model was not a trade secret, the court limited this holding by explaining the revenue, unlike the pricing model, did not contribute to Lyft's competitive strategy. *Id.* at *2. The court is essentially saying the revenue, without access to the pricing model, has no independent value requiring the revenue to be sealed as a trade secret. *Id.* This is contrary to Lynx's pleadings regarding Trade Secret B. Lynx pleads that the output of Trade Secret B is valuable. Even if Trade Secret B is nothing more than an output, Lynx sufficiently pleads it is a trade secret. Safelite's argument is ultimately a dispute of fact.

Finally, Safelite argues that Trade Secret C is not a protectable trade secret because Lynx failed to protect Trade Secret C's confidentiality and it is generally known. As discussed above, this argument fails, and Lynx sufficiently pleaded Trade Secret C. *See supra* Section III.A.3.

---

[9] This Court disagrees with Safelite that *NEXT Payment Solutions, Inc.* supports the proposition that algorithmic outputs cannot be sufficiently pleaded as protectible trade secrets. *NEXT Payment Solutions, Inc. v. CLEAResult Consulting, Inc.*, 163 F.4th 1091 (7th Cir. 2026). First, that case is postured at summary judgment, not dismissal based on the pleadings. Second, the plaintiff in *NEXT Payment* sought to qualify algorithmic software as trade secrets by presenting evidence of the software's output, not evidence of how the software works. *Id.* at 1096–98. This evidence was insufficient to survive summary judgment. *Id.* This case does not comment on whether algorithmic outputs on their own could be a trade secret, only that algorithmic outputs are insufficient to prove the algorithmic process at summary judgment.

**2**

Safelite argues that even if Lynx sufficiently pleaded Trade Secrets A, B, and C as trade secrets, Lynx failed to allege that Safelite misappropriated trade secrets. (D. 76 at ECF pp. 20–24). Under the DTSA and ITSA, a complaint must allege that the defendant misappropriated a trade secret in one of three ways: (1) unauthorized acquisition, (2) disclosure, or (3) use of a trade secret, by a person who knows or has reason to know that the secret was improperly acquired. *J.S.T. Corp. v. Foxconn Interconnect Tech. Ltd.*, 965 F.3d 571, 577 (7th Cir. 2020); *see* 765 ILCS 1065/2(b)(1)–(2). Lynx pleads acquisition, knowledge, and use. (D. 84 at ECF p. 19). The Court agrees that Lynx sufficiently pleaded that Safelite misappropriated Trade Secrets A, B, and C through unauthorized acquisition. Sufficiently pleading unauthorized acquisition is enough for Lynx to survive dismissal, so the Court does not consider Lynx's arguments for misappropriation by knowledge or use.

To plead misappropriation by acquisition, the complaint must allege "acquisition of a trade secret of another by a [defendant] who knows or has a reason to know that the trade secret was acquired by . . . theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy". 18 U.S.C. § 1839(5)(A), (6)(A). The "Seventh Circuit case law applying the ITSA contains an added element: that the defendant actually used the trade secret in its business." *Hilco Diligence Servs., LLC v. Sikich, LLC*, No. 25 CV 1002 , 2025 WL 1455825, at *3 (N.D. Ill. May 21, 2025) (internal quotations omitted) (citing *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992)).

Here, Lynx's Amended Complaint states sufficient factual allegations to support a plausible claim for misappropriation by acquisition. Lynx pleads that Safelite and Lynx were direct competitors, that Safelite knew Lynx was State Farm's glass vendor, and that Safelite reached out to State Farm soliciting both

State Farm's business and Lynx's Trade Secrets A, B, and C. (D. 66 at ECF p. 29). Lynx further alleges that State Farm shared "substantial volumes of data containing proprietary information from" Lynx's Trade Secrets A, B, and C with Safelite after Safelite replaced Lynx as State Farm's glass vendor. *Id.* Lynx alleges that State Farm's disclosures to Safelite violated State Farm's duty to maintain secrecy under the Agreement with Lynx. *Id.* Furthermore, Lynx pleaded that Safelite knew State Farm owed Lynx a duty of confidentiality when Safelite solicited State Farm's business from Lynx. And, even if Safelite did not know, Safelite learned of Trade Secrets A, B, and C's confidentiality from a May 2025 letter in which Lynx provided Safelite with actual notice, which Safelite disregarded continuing its misappropriation of Trade Secrets A, B, and C. *Id.* Finally, Lynx alleges that Safelite used Lynx's trade secrets "including through use in its 'new' National Offer and Acceptance Agreement sent to auto glass service providers." *Id.* at ECF p. 30.

The Court must view the pleadings in Lynx's favor at this stage. Moreover, "where pleadings concern matters peculiarly withing the knowledge of the defendants, conclusory pleading on 'information and belief' should be liberally viewed." *Brown v. Budz*, 398 F.3d 904, 914 (7th Cir. 2005). Naturally, Lynx's Amended Complaint will include allegations "on information and belief" when alleging the facts concerning State Farm and Safelite's relationship after Lynx and State Farm's relationship ended. Lynx's pleadings contain sufficient facts and allegations to tell a plausible story: State Farm hired Lynx as its glass vendor because of Lynx's Trade Secrets A, B, and C, which Lynx continued to build and improve while serving State Farm; Safelite sought to poach both State Farm's business and Lynx's systems (trade secrets) and offered State Farm a deal it could not pass up; State Farm swapped Safelite for Lynx, keeping Lynx's processes. Safelite's arguments for misappropriation are ultimately questions of fact not

appropriate for resolution at this time. In conclusion, Lynx's Counts V and VI should not be dismissed at this time.

**D**

Finally, Safelite argues that Count VII, Lynx's unfair competition claim, should be dismissed because Lynx's ITSA claim preempts the unfair competition claim. (D. 76 at ECF p. 24). For the reasons stated below, this Court disagrees with preemption and dismissal here.

The ITSA "is intended to displace conflicting tort, restitutionary, *unfair competition*, and other laws of this State providing civil remedies for misappropriation of a trade secret." 765 ILCS § 1065/8(a) (emphasis added). The ITSA "abolishes claims other than those based on contract arising from misappropriated trade secrets, replacing them with claims under [the ITSA] itself." *Hecny Transp., Inc. v. Chu*, 430 F.3d 402, 404 (7th Cir. 2005). "Put differently, courts, in deciding whether the ITSA's preemption applies, ask whether a plaintiff's claim 'would stand regardless of whether trade secrets were at issue.'" *Plaintiff, Inc. v. Slesinski*, No. 23-cv-03878, 2025 WL 1677497, at *11 (N.D. Ill. June 13, 2025) (citing *Gen. Elec. Co. v. Uptake Techs, Inc.*, 394 F.Supp.3d 815, 835 (N.D. Ill. 2019)).

Here, Lynx's unfair competition claim would stand regardless of whether trade secrets were at issue, so Lynx sufficiently pleaded the unfair competition claim. In alleging the unfair competition claim, Lynx alleges it "maintains confidential information *and* trade secrets", and Safelite improperly used both. (D. 66 at ECF p. 37) (emphasis added). Safelite argues that Lynx alleges "confidential information" and "trade secrets" to describe the same underlying information, and adding the phrase "confidential information" is "a distinction without a difference." (D. at ECF p. 25). Ultimately, Safelite is raising a factual dispute. Reading the Amended Complaint and the attached Agreement in Lynx's favor, Lynx sufficiently pleads that Lynx granted State Farm a license to use Trade

Secrets A, B, and C as well as other confidential information protected by the Agreement.

Safelite's reliance on *Spitz*, while persuasive, is untimely at the motion-to-dismiss stage. In *Spitz*, the Seventh Circuit affirms summary judgment in favor of the defendant, dismissing the plaintiff's common law claims because the claims "are essentially claims of trade secret misappropriation." *Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 733 (7th Cir. 2014). A few key differences prohibit this Court from applying the holding in *Spitz* to these facts. First, the Court is deciding a motion to dismiss and must construe the pleadings in Lynx's favor. Additionally, all the parties before this Court agree that the Agreement between Lynx and State Farm was a binding contract that holds State Farm to confidentiality provisions. By contrast, the Seventh Circuit affirmed in *Spitz* that a binding contract did not exist. *Id.* at 730–33. Because the Agreement is a binding contract with confidentiality provisions protecting both Lynx's confidential information and trade secrets, Lynx would have an unfair competition claim regardless of whether trade secrets are at issue. Without ruling on factual disputes and construing the pleadings in Lynx's favor, Lynx sufficiently pleaded the unfair competition claim, and it is not preempted by the ITSA claim. Lynx's Count VII should not be dismissed.

**IV**

For the reasons set forth *supra*, State Farm's Motion to Dismiss (D. 73) is DENIED and Safelite's Motion to Dismiss (D. 76) is DENIED. The Defendants answers are due 14 days from today's date.

Should a party file a motion for reconsideration which is subsequently denied by the Court, the party who filed the motion will be responsible for the attorney's fees of the opposing party related to their response to the motion for reconsideration.

This matter is referred to the Magistrate Judge for further proceedings.

*It is so ordered.*

Entered on October 13, 2026

s/Jonathan E. Hawley
U.S. DISTRICT JUDGE